**STATE of Missouri, Respondent,**

v.

**Frank JAMES, Appellant.**

No. 46713.

Supreme Court of Missouri,
Division No. 2.

March 9, 1959.

Daniel T. Tillman, St. Louis, for appellant.

John M. Dalton, Atty. Gen., Hugh P. Williamson, Asst. Atty. Gen., for respondent.

BARRETT, Commissioner.

The appellant, Frank James, upon a charge of robbery in the first degree and allegations of prior felony convictions has been found guilty and sentenced to life imprisonment. In almost incomprehensible hortatory jargon the substance of the charge was that on July 13, 1957, the defendant "with force and arms" made an assault upon Rose Salensky and Rose "in fear of an immediate injury to her person, then and there feloniously did put," the defendant, presumably, by "force and violence" took $178 of which she was in charge, the money belonging to Dave Sherp, doing business as Dave Sherp's Market at 2101a Cole Avenue. The quotations, particularly the words "fear" and "by force and violence," are for emphasis and future notation. The defendant admitted the prior convictions and sentences, beginning in 1947 when Frank was seventeen, one year in the workhouse upon a charge of assault with intent to rob, 1949 a sentence of six months in the workhouse for assault with intent to ravish, in 1950 a sentence of ninety days in the workhouse for carrying concealed weapons, and in 1957 a sentence of sixty days in the workhouse for carrying concealed weapons.

All of the principals, the defendant, the witnesses and others, are Negroes, and some of the witnesses were not articulate as to some very important and vital matters; they were hesitant and doubtful and often not orientated. Sherp's Market was

owned by Dave Sherp and his wife but on July 13, 1957, they had left Mrs. Sherp's mother, Rose ("Baba") Salensky in charge of the store. About three o'clock that afternoon there were present and in charge of the store these employees: Rose Salensky, Mary Lee who had been a clerk for eight years, Norman Lee Benson, a boy of fifteen who was a clerk and handyman, and Ozzie Brooks, a boy of eighteen or nineteen, who was away at school when the case was tried and did not testify. There were also several patrons in the store, perhaps eight or more, but those in charge could identify them by their first names only even though they were long-time, regular customers. The defendant denied that he had been in the store but according to Mrs. Sherp and Mary Lee he was a frequent customer, particularly in the liquor department, and Mary Lee and Frank had once lived in the same block when they were children. While Rose was unable to identify Frank as the person who assaulted her and took the money from the cash register, she distinctly remembered his coming in the store that morning and buying a ten-cent cake. So, unquestionably, the appellant was personally known to Mary Lee, if not to others employed in the store, and although she was probably the only witness able to do so she unequivocally identified the defendant as the person in the store about 3:10 that afternoon and at a later date in the police "line-up" as well as upon his trial.

About 3:10 Mary Lee was at the meat block when she heard "Baba" scream and she ran to the back part of the store and saw "Baba" on the floor, the defendant standing over her. She returned to the vicinity of her former position and turned on the burglar alarm and immediately ran back to the "kitchen part" where Rose and the defendant had both been on the floor. Mary Lee says that the defendant was standing between her and Rose, "no one could think of what to do next," and then he turned and moved past her "and he slapped me up on the side of the face." But as he turned "there was a Seven-Up bottle setting on the table, and I took and picked up the Seven-Up bottle and threw it at him, and by that time he went to come at me, so I ran back in the back, in the back farther we keep a lot of pots and pans there, and I picked up the top of a boiler that we have there and ran out in the front and hit him from the back in the back, that is all." Rose and Norman saw Mary Lee hit Frank in the head with the Seven-Up bottle and one of the disputed issues, bearing on identification as well as other matters, was whether the unhealed gash on his head was caused by the crashing Seven-Up bottle. Mary Lee and Rose saw Frank punch the cash register, take out the contents and run out the front door. Mary Lee only saw the defendant, Frank, she did not see anyone else with him. She said, "What I mean is I don't know whether there was two of them was together or not." Except as subsequently noted, she was not asked and apparently did not see a weapon of any kind in Frank's hands or in the hands of anyone else.

Rose, who is blind in one eye "and I don't know exactly how much eyesight I have," could not, as has been noted, identify Frank as the person who assaulted her. And again except as subsequently noted, she said, "if he had a weapon, he didn't show it," and she was not asked whether she saw anyone else with a weapon. This was her summary narrative of the occurrence: "Well, I was standing at the cash register and a man came around and grabbed my hand, he didn't say a word, he pulled me, and I shoved him about three or four different times, he turned around and saw a gun on my shelf, and he picked it up, and seen it was a toy gun, and he threw it down and grabbed ahold of me, and he pushed me back into the kitchen, and I was still holding on to him, and I started screaming, and as I was holding on to him, he pushed me on the floor and he fell on top of me, and then Miss Lee came running in, the first thing she stepped on the alarm, and then he got up, and as he

was passing her, he kind of slapped her, and she grabbed ahold of a 7–Up bottle, there was a 7–Up bottle, she grabbed ahold of it and threw it at him, as he was running out, he still didn't say a word, he pushed this register and grabbed ahold of the money, and she took the top of a roaster and threw it at him, that is all."

■ These particular facts and circumstances are not noted for the purpose of determining whether the evidence adduced by the state made a submissible case of robbery in the first degree, these and other circumstances not now noted were sufficient for that purpose (V.A.M.S. § 560.120; State v. Whitley, 327 Mo. 226, 36 S.W.2d 937); these particular circumstances are related for the background and in connection with the one serious and meritorious point the appellant makes upon this appeal —that the trial judge, over the defendant's objection, unduly injected himself into the trial of the case and improperly asked improper questions of Rose Salensky, Norman Benson and Officer Russo. In his brief here it is said that these and other questions by the judge "indicated the judge's feeling against the defendant and his belief of defendant's guilt contrary to the law of this state." In his motion for a new trial the assigned grounds were that the court erred in directing a question to Officer Chandler to straighten out inconsistencies in the officer's testimony, that the court erred "in the line of questions directed to Mrs. Salensky that brought out the facts of fright, failing of her sight and force used against her and that money was taken against her will and other questions that went to prove elements of State's case" which it is said deprived the appellant of a fair and impartial trial and conveyed to the jury the impression that the judge thought the defendant guilty, and that the court erred in directing questions to Norman Lee Benson "that would put him in a position to see things that he had placed himself in a position where he could not see them."; In this connection it was said that "The

Judge assumed a role of assisting the Assistant Circuit Attorney in so doing."

In the trial of this case there were the usual, normal and appropriate responses by the trial judge in ruling on objections, making necessary routine suggestions, and there were the usual formal routine questions and, of course, there is no objection to any of these comments or questions and they have not been counted or considered. We are not concerned here with a judge's remarks and reasons given in ruling on objections (State v. Murray, 316 Mo. 31, 292 S.W. 434; 2 Underhill, Criminal Evidence, Sec. 496, p. 1216), and we are not concerned with the routine objection that the judge has inadvertently and improperly orally summed up or commented on the evidence instead of giving written instructions. Sup.Ct.Rule 26.09, 42 V.A.M.S.; State v. Fields, Mo., 314 S.W.2d 723. Neither are we concerned with the judge's having to deal with recalcitrant and unresponsive witnesses (annotation 84 A.L.R. 1172, 1208), the witnesses involved here were all state's witnesses, they were most willing and cooperative and as responsive as their powers of observation, description and speech permitted. In addition to the usual responses and formal informational inquiries the judge in the trial of this case directed one hundred sixty-five questions to the witnesses, two of the questions were directed to the defendant and his single witness, the other one hundred sixty-three questions were in the examination of the state's witnesses. All of the testimony covers but 164 pages of a minimum word 200-page record, 140 pages devoted to the state's witnesses and about 20 pages devoted to the defendant and his witness. There was no objection to most of the judge's questions and many of them were proper attempts to clarify distances and places, to prevent unnecessary confusion, and to orientate witnesses. State v. Kornegger, 363 Mo. 968, 255 S.W.2d 765. For example, there was no objection to the judge's examination of Mary Lee, but the examination to which objection was made

may not be understood or properly considered other than in the context and atmosphere of the trial and to illustrate the nature and subject of the questions in general and the extent of the trial judge's participation in the examination of witnesses it is necessary to note some of her examination as well as that of other witnesses.

One of the important, telling questions was whether Frank had an accomplice and if so whether the accomplice had and employed a weapon, although this was a charge of first degree robbery and not robbery by means of a dangerous and deadly weapon, the difference being that the latter is punishable by death. V.A.M.S. §§ 560.120, 560.135. At one point in her examination Mary Lee had said that she had asked some unidentified man to let her by; when finally asked whether she had seen another man near the door, she said, "No, I couldn't say that there was other men or not, because I only asked the man to let me by, and that he did." At this point the judge again interposed and there were these questions and answers:

"The Court: When was that, after the man you talked about before had left? A. Yes.

"The Court: And then you wanted to leave too, is that right, you wanted to get by? A. That is right.

"The Court: You mean by getting by, you wanted to go out the front door? A. No, I wanted to go across that little aisle there over to the northwest.

"The Court: This was somebody that was still in the store after the man that you talked about before had left, is that right? A. That is right.

"The Court: You said that the man took some money and then he left, is that right? A. That was before.

"The Court: Oh, previous to that you asked the man to step aside so you could get out? A. Yes.

"The Court: And you don't know where that man went to afterwards, is that it? A. What I mean is I don't know whether there was two of them was together or not."

At this point the state's attorney developed that the only person Mary Lee had seen, connected with the robbery, was Frank James and then he said, "And if there was another man at the door with a knife you didn't see him one way or the other, is that right? A. No, I didn't."

In the course of Rose's testimony she said, as did Mary Lee, that Frank picked up a toy gun from a shelf in the store, "clicked it" and threw it on the floor. Rose said that some child had left the toy gun in the store and it had been placed on a shelf in the event someone claimed it. The state's attorney had asked this question: "Mrs. Salensky, can you positively say that this—is it your testimony you couldn't say that this man had this gun?" Rose answered: "He didn't have a gun." At this point the court again interposed and there were these questions and answers and defense counsel's noted objection:

"The Court: Did you say he didn't have a gun? A. No, he didn't have no weapon at all.

"The Court: You mean when he came in? A. If he had a weapon, he didn't show it.

"The Court: Is that gun there (Ex. 1) the only gun that you ever saw there that afternoon? A. Yes, that was a toy, you know, we had it there back on the shelf, some little child left it there, and they put it back there.

"The Court: You said that you were nervous and excited? A. Yes.

"The Court: Were you also frightened then in that incident? A. After

he thrown me down, after, you know, he threw me down, I got excited, and I was excited, I didn't know what he was going to do.

"The Court: I say were you also frightened? A. I sure was."

Defense counsel announced that he had no further questions and out of the hearing of the jury this occurred:

"Mr. Tillman: I will object to the last line of questioning for the reason that it is improper.

"The Court: That is all you wanted to say?

"Mr. Tillman: Yes.

"The Court: That objection I over-rule. Now, I may say that I feel it would have been Mr. Harris's proper function to establish that, because robbery consists either of taking something by force or by putting a person in fear, and I felt that it was necessary, though it was probably obvious and was to be inferred, I thought it was desirable if not neccessary that the question be asked by somebody before the witness left the stand. It would have suited the Court better if the State's counsel had asked it and the Court hadn't had to; but I do not think the objection that has been made is one that could be or should be sustained."

The next witness was the fifteen-year-old boy, Norman Lee Benson, and the court interposed in his direct examination almost immediately, and while there was no objection to it the court's examination is important, particularly in view of the doubtfulness of what the boy said under the court's examination. The boy told about "this man" pushing Mrs. Salensky, grabbing and clicking the toy gun, pushing her over and falling on her. Through a series of questions, twelve on this subject, the court developed fully where the boy was, where the cookie shelf was, where the merchandise was and especially whether there was anything to interfere with his vision. Finally the boy and the court said:

"A. No, sir, I looked over the top of the counter.

"The Court: And you saw the incident of the man reaching for this gun and heard the click?

"A. Yes, sir.

"The Court: All right, you may resume questioning. I just wanted to get the scene a little bit clearer."

Norman then identified the defendant as the person pushing Mrs. Salensky, he described Mary Lee's throwing the Seven-Up bottle and again he reluctantly and doubt-fully identified the defendant finally saying, "I am not sure about that is the man. I am not sure that is the man there." The state's attorney then asked Norman the question, "did you see anyone else in the store?" Norman said that he did and the state's attorney inquired, "What was he doing?" Norman said, "The other person had a knife on a friend of mine named Ozzie or Ozell." Then the question was: "What kind of a knife was it? A. Ozzie told me a switchblade." Defense counsel objected to Norman's testifying to what someone told him. The court sustained the objection but continued this line of inquiry:

"The Court: Objection sustained to the statement of the witness of what his friend told him, that being hearsay, and it is stricken out and the jury will disregard it. I assume from what you said, Norman, that you did not get a good enough of a look at the knife so that you could tell us from your own view of it what kind of a knife it was? A. Yes, sir.

"The Court: And when you said that the man, a man had a knife on your friend Ozell, what did you mean by that it was on him, you mean he placed it against his body or just

pointed it toward him, or what did you mean? A. He pointed it toward him.

"The Court: I see; where was your friend Ozell at that time?

"A. Back of the meat counter in the back."

The judge continued his inquiry at some length as to how Ozell was dressed, his age, where he was at the time of the trial and said, "Now you may resume." The state's attorney continued his questioning of Norman about the other man and the knife:

"Q. Now, this man, did you see him holding the knife, you saw him, did you see him holding the knife?

"A. I didn't see him with the knife, but I saw Ozell."

At the conclusion of Norman's testimony the court again interposed:

"The Court: Now, you said something about the man who was in there having a pint of wine. Is that something that you saw the man have when he came in? A. That is right.

"Q. (Apparently state's attorney.) It wasn't something that he took, or bought while there? A. No.

"The Court: And you noticed that while these events were going on? A. Yes, sir, I remember that.

"The Court: Did the man have any hair on his face? (Referring to the defendant.) You say he had no mustache, did he have any unusual hair on his face? A. Right on here.

"The Court: You mean he had some hair beneath his lower lip, and right in the indentation between the lower lip and the chin, is that what you mean? A. Yes."

The next witness was a patrolman, Russo, who had investigated the robbery and interviewed the witnesses, particularly Mrs.

Salensky. He did not interview Norman, he said that he did not see him. Defense counsel was cross-examining this witness as to the information he had obtained, particularly with respect to the description the witnesses had given of the defendant, and then there was this question and answer with respect to the supposed accomplice:

"Q. Well, did they give you the description of this other man? A. No, they did not."

At this juncture the court again interposed and these were the questions, answers and objections:

"The Court: Did you previously say that you got a description of two men? A. Yes, we did, your Honor, but—

"The Court: When did you get the description of the other man? A. By one of the customers in the store, who refused to give their name, your Honor.

"The Court: Was Norman Benson there, I am referring to the young colored boy who was in court before you as a witness, was he there when you made the investigation? A. I didn't see him, your Honor."

(Out of the hearing of the jury.)

"Mr. Tillman: Defendant's counsel will object to this line of questioning by the Court.

"The Court: That is the whole statement? No grounds are given. The objection is overruled.

"Mr. Tillman: I would like to state the grounds of my objection is first, it is prejudicial, the Judge brings out essential elements of the State's case.

"The Court: I do not think the last questions should be so described. I overrule the objection. The purpose of the questions was only to get information."

There is no disposition on the part of this court to infringe upon trial judges' discretion in reasonably projecting themselves and their personalties into a criminal proceeding; we agree with Professor Wigmore that a criminal trial is not a "sporting" event or a game of skill and trial judges are not mere "umpires" of games. We likewise agree with him that trial judges "perform an active and virile part as a director of the proceedings and as an administrator of justice" and there is no inclination to infringe upon these inherent but awesome prerogatives. 3 Wigmore, Evidence, Sec. 784, p. 151. While the trial judge is not "a mere moderator," he exercises his power as the "active and virile" director or "governor of the trial" for "the purpose of assuring its proper conduct and the fair and impartial administration of justice between the parties to the litigation. The wide discretionary powers vested in him are to be exercised so that abuses of justice shall not be accomplished under forms of law. * * * Upon the trial judge rests the responsibility of striving for an atmosphere of impartiality." 53 Am.Jur., Sec. 74, p. 73. Among the judge's inherent powers in the administration of justice is his power to interrogate witnesses; "One of the natural parts of the judicial function * * * is the judge's power and duty to *put to the witnesses* such *additional questions* as seem to him desirable to elicit the truth more fully." 3 Wigmore, Evidence, Sec. 784, p. 152; 3 Wharton, Criminal Evidence, Sec. 842, p. 211; 23 C.J.S. Criminal Law § 991, p. 344; 3 Am.Jur., Sec. 1056, p. 606.

The trial judge's discretionary power to interrogate witnesses in a criminal trial is subject to certain limitations, however, and the limitations are best indicated, perhaps, by direct quotation and reference to cases rather than by an attempt to specifically demonstrate upon this record and characterize. The judge's power to put questions to witnesses in a jury-tried criminal case "should be exercised with greater caution" than he might exercise in a civil case or in any case tried without a jury. 58 Am.Jur., Sec. 558, p. 311. The mere number of questions propounded may not be a suitable guide; on the other hand, insistent, protracted examination of witnesses and constant interpolation by the trial judge may impair the desired "atmosphere of impartiality" to which the accused is entitled. "Ordinarily very brief interrogation is sufficient to accomplish this purpose, while a protracted examination would have a tendency to indicate his opinion on the facts, or as to the credibility of the witness. Therefore, reviewing courts are inclined to view with disfavor an extended examination of a witness by the trial judge." Annotation 84 A.L.R., loc. cit. 1193; 2 Underhill, Criminal Evidence, Sec. 496, p. 1216. Another danger in a trial judge's persistent examination of witnesses is indicated by State v. Jones, Mo., 197 S.W. 156, 158. There in an abortion-manslaughter case this court observed that at one point in the cross-examination "the trial judge himself took it up in a manner to indicate that the prosecutor was not developing facts against defendant as fast as he ought to do, and carried on the examination with great vigor and to such length that four type-written pages were necessary to transcribe his questions and the answers to them. * * * But the principal harm of the proceeding was the fact that the judge himself cross-examined, not tactfully, in a manner to bring out some forgotten fact, but in a way to indicate there was no innocent reason why defendant should employ Dr. Bowline." In State v. Drew, Mo., 213 S.W. 106, loc. cit. 107, the court again said of a trial judge: "Also he cross-examined the witness Helen Smith, a colored girl, whose testimony reflected upon the character of Minnie Williams. The judge asked questions in the endeavor to show that Helen Smith was a chum and confidential friend of Minnie. *These cross-examinations were such as the prosecutor might have made,* and indicated a purpose to discredit the

defendant and his witness." Perhaps the whole subject could not be better summed up than Judge Learned Hand did in United States v. Marzano, 2 Cir., 149 F.2d 923, 926, where a trial judge of his own volition administered the oath to two witnesses and improperly compelled them to testify in a case in which the defendant was convicted of selling morphine. "Moreover, even if the jury were not as likely as seems to us to be the case, to have so understood what took place, *the judge was exhibiting a prosecutor's zeal, inconsistent with that detachment and aloofness which courts have again and again demanded, particularly in criminal trials. Despite every allowance he must not take on the role of a partisan; he must not enter the lists; he must not by his ardor induce the jury to join in a hue and cry against the accused. Prosecution and judgment are two quite separate functions in the administration of justice; they must not merge."* (Italics supplied.)

The utmost deference is due the experienced and most capable judge who presided at this trial; he was within his powers in interrogating the witnesses, "but in the manner in which he used them we think that he exceeded them" (United States v. Marzano, supra; State v. Drew, supra; State v. Jones, supra), and accordingly the judgment is reversed and the cause remanded.

BOHLING and STOCKARD, CC., concur.

PER CURIAM.

The foregoing opinion by BARRETT, C., is adopted as the opinion of the Court.

STORCKMAN, P. J., EAGER, J., and BROADDUS, Special Judge, concur.