Harry SPARKS and Rex Sparks, Plaintiffs (Respondents),

v.

Frank DANIELS and Ethelriede Daniels, d/b/a Decorative Guild Shop, Defendants (Appellants).

No. 30527.

St. Louis Court of Appeals.

Missouri.

Feb. 27, 1961.

Hal B. Coleman, Coleman, Gerhard, Padberg, Montrey, Maloney & Cekovsky, Clayton, for appellants.

Carroll J. Donohue, Myron Gollub, Husch, Eppenberger, Donohue, Elson & Jones, St. Louis, for respondents.

BRADY, Commissioner.

Respondents brought this action against the appellants to recover for appellants' allegedly negligent damaging of eight needlepoint seat covers. Jury trial resulted in a verdict and judgment in the amount of $800 and this appeal was timely taken and duly perfected. The petition was filed in April, 1956, and trial was in October, 1959, with verdict and judgment being entered upon the 2nd of that month. Motion for new trial was filed on the 13th, the 12th being a legal holiday, and the notice of appeal was filed on the expiration of 86 days from that filing and was therefore premature. This defect is cured by the provisions of Sup.Ct. Rule 3.24 (see Civil Rules 78.04 and 82.05, V.A.M.R.) We heard the case during our December docket, 1960.

There is no dispute as to the facts. The respondent, Mrs. Sparks and her mother began to make eight needlepoint seat covers in January, 1955. In November of that year they had completed two of them and she contacted the appellants and advised that she wanted these two pieces used on two chairs she had, but that since she intended to get bigger chairs later she did not want it cut or flattened out but built up so that it would not be discolored when later transferred to the larger chairs. The appellants maintain that they were only instructed to pad out the seats and cover them. These two chairs were properly done and in accordance with Mrs. Sparks' instructions. Later that same month, Mrs. Sparks and her mother had completed three more needlepoint seat covers and she again contacted the appellants and asked that these be picked up at her house. Her testimony was that she suggested that appellants also take one of the completed chairs with them so the work would be identical. The appellants maintain that there was no conversation with Mrs. Sparks before these last three chair seats and needlepoint came into their shop, and that when the appellants got the telephone call from Mrs. Sparks the morning after the needlepoint and chairs were picked up, the needlepoint had already been cut for the chair seats. The chair seats were returned to Mrs. Sparks covered with the needlepoint, but cut, and not padded out. Mrs. Sparks' testimony was that the three seat covers as cut had no value and that she was unable to use these three seat covers, and together with her mother, made three more and re-covered the seats. She further testified that she had never tried to sell needlepoint and that you could not get handworked needlepoint done in the market.

The respondents' expert witness, Tucker, had been in the business of manufacturing embroidery for 35 years. He testified that needlepoint is a form of embroidery, and his company had produced hand needlepoint

in the past but that in more recent times wage scales have made handwork commercially unfeasible, and that while he did have persons who did hand needlepoint, he would only do so for a customer he could not refuse; that he began to get out of that work and did his work with machines from five to seven years prior to the trial date. Over objection, he was allowed to testify that the reasonable market value of respondents' handworked needlepoint seat covers was a minimum of $200 each. He further testified that he would have charged more for it, and that his opinion was based upon his experience as a manufacturer, the intricacy of the pattern, the number of square inches involved and on the hourly labor involved, and did not include in his consideration the cost of the material or the overhead, as these were commercial items.

The appellants have preserved three points for our decision. They urge that the trial court erred in permitting jurors to propound questions to respondents and their witnesses, and in overruling their motion for a mistrial based upon the trial court's action in permitting the exhibits of both parties to be passed among the jury at the same time; that the trial court erred in permitting respondents' expert witness to testify as to the value of the needlepoint seat covers; and that the trial court erred in giving Instruction No. 8.

The trial judge made some remarks to the jury at the opening of the trial which comprise slightly over four pages of the transcript. During the course of these remarks, he dealt with conferences between court and counsel and why these were held out of the jury's hearing, the need to pay very close attention to the testimony, objections by counsel and the effect of his ruling thereon, the hours of trial and the recesses he intended to take, and their conduct during those recesses with regard to avoiding discussion of the case, and that the parties' opening statement, while not evidence, should be paid attention to. In response to a juror's question, "Can we jot down notes?" he replied, "I wish I could say yes, but the Supreme Court held that is not proper. I won't go into their reasoning but since the Supreme Court so holds I have to enforce it."

During the course of the trial court's remarks concerning the need for the jury to pay very close attention to the testimony, the court, after stating that disagreements between counsel, particularly in closing arguments as to what was said and the interpretation thereof, often arise, stated

"* * * and I have to leave it up to you to decide what was actually said and what is the proper interpretation, so it is very important for you to hear and understand every word. If you do not hear what a witness says, which often happens in this room, because the acoustics are very poor, *or if the language does not carry meaning to you, raise your hand and I will have the witness repeat what he or she has said or use different language that will carry meaning to you,* but if quite a period of time has elapsed and the question arises I have made it the practice in my courtroom that I do not take the time to have my reporter go back in her shorthand notes and try to uncover the particular passage. It takes longer than you think, and that is the rule I have adopted, and I have been so upheld by the Supreme Court." (Emphasis supplied.)

The trial then proceeded. The first question put by any juror was as to how he should inform the trial court of his inability to hear part of the testimony. The juror had evidently raised his hand before asking the question and was told to do "Just the way you have done." Then the appellant offered into evidence Exhibit No. 2, which was the form of the needlepoint, and the following occurred:

"The Court: Exhibit 2 is received.

"Defendants' Exhibit 2 was here admitted into evidence.

"Juror No. 4, Arthur B. Winkel-meyer: Your Honor, can the jury examine such evidence?

"The Court: I'll find out in just a minute.

"Mr. Coleman: Yes, that was the next thing. Your Honor, I would like permission to pass this to the jury, if I may.

"The Court: That may be done.

"Defendants' Exhibit 2 was passed to the jury for their examination.

"The Court: I note juror number one raised his hand.

"Juror No. 1, Alfred F. Topp: I would like to know whether I am out of order or not in asking a question regarding this piece of warp.

"The Court: There is no harm in asking the question, but, of course, questions from jurors are subject to the same rules of evidence the questions of the lawyers are subject to. So ask the question, then we will—

"Juror No. 1, Alfred F. Topp: I would like to know whether this additional piece of warp was added to the original piece of warp before or after the needlepoint was done. That is a question in my mind that I am trying to get an answer to.

"The Court: I will ask counsel, is there any objection you would like to make?

"Mr. Donohue: I would be happy to have that answered.

"Mr. Coleman: I have no objection.

"The Court: Mrs. Daniels, do you understand the question? A. This is what happened. I cut the piece off the bottom of the form, sewed it back on and then, of course, stitched over it.

"The Court: I note that Juror number four has raised his hand. What is the question?

"Juror No. 4, Arthur B. Winkel-meyer: May we see Exhibits B, C, or D?

"The Court: I'll answer that in just a minute.

"Mr. Donohue: We would be happy to pass those to the jury.

"The Court: All right; you might start with juror number twelve and it can follow the course of Exhibit 2.

"Mr. Donohue passes plaintiffs' Exhibits B, C, and D to the jury for their examination.

"The Court: I note that Juror number eight has raised his hand.

"Juror No. 8, Arthur C. Clark: I would like to know when this was done —this repair job we are looking at— was it last week, several years ago or—

"The Court: Do I hear any objection to the last question?

"Mr. Coleman: No.

"The Witness: Yes; last Saturday night."

The appellants' counsel thereupon made his objections to the jurors' questions and also to the respondents' exhibits being passed to the jury at the same time as appellants'. This objection was made out of the jury's hearing. During the course of these remarks between court and counsel the following occurred:

"The Court: Mr. Coleman, I agree with you that it is irregular to have plaintiffs' exhibits being passed from hand to hand among the jurors following the passage of Defendants' Exhibit 2. However, when the juror asked that that be done it was the Court's impression that you had ample time to come up to the bench and make your objection to that procedure, but you failed to do so, so I raised no question as to the irregularity myself.

"Mr. Coleman: If the Court please, I did not come up to make an objection at that time for the reason I felt I would be prejudiced because these are questions of the jurors, which, to me, are much more important, and call the attention of the other jurors more than the answers of the witness to counsel's questions.

"The Court: Those are the hazards of jury trials. I didn't invite these questions. It only shows you have a very interested jury, and your objection is now overruled."

The next incident of questioning by jurors took place during the testimony of the next witness for appellants.

"Mr. Coleman: Q. Mrs. Howe, again referring to Plaintiffs' Exhibit B, and directing your attention to the flowers in the middle of that exhibit— is that a different type of needlepoint in there? A. This is petit point and this is needlepoint (indicating).

"Q. What is the difference between petit point— A. Difference in stitch. This stitch (indicating) is real fine, whereas this (indicating) is a larger stitch, and, no doubt—they are both done by machine, as far as that goes.

"Q. Have you ever done petit point stitching?

"Juror No. 4, Arthur B. Winkelmeyer: There was a phrase I missed completely.

"A. This is petit point (indicating). It is a smaller stitch, and this on the outside (indicating)—isn't that awful—

"The Court: The jurors—

"A. This is needlepoint (indicating), and this is petit point, (indicating).

"Mr. Coleman: Q. When you say needlepoint you are referring then to the—

"The Court: Number four has a question.

"Juror No. 4, Arthur B. Winkelmeyer: She didn't answer—there was a phrase she used in there that I missed completely. She said something between what she is talking about now— the needlepoint and the petit point.

"The Court: I don't know what it was that you are unable to hear. Do you recall anything else that came just before or after— A. I believe, your Honor, that I said that the petit point was machine-stitched.

"Juror No. 1, Alfred F. Topp: You said they were both made by machine. A. That's right.

"The Court: Are you referring— A. I'm not referring to the filled-in background.

"Mr. Coleman: Will you step up, please?

"(Out of hearing of the jury):

"Mr. Coleman: I'm going to object to the jurors entering into the trial of this lawsuit.

"The Court: What do you want the Court to do?

"Mr. Coleman: I want the Court to direct a mistrial for the reason that the jurors are cross examining my witness, as evidenced by the last question, and not only that, they are putting words in my witness' mouth and I'm asking for a mistrial.

"The Court: Do you want a mistrial?

"Mr. Donohue: I'll let that problem be lodged in the sound—

"The Court: I am noted for, when both attorneys want a mistrial, I grant it.

"Mr. Coleman: I am very serious.

"The Court: I won't grant the mistrial for the reason that the jurors, or at least the last question, in my opinion, was an effort on the part of the juror to hear for sure something he wasn't sure he heard. Perhaps that type of question I did invite at the beginning of the trial when I told the jurors if they didn't hear anything a witness said, if they would raise their hand I would see to it that the witness then and there repeated what he or she had said, and, for that reason, I overrule your request for a mistrial.

"Mr. Coleman: My motion for a mistrial goes further. There was a further statement by the—I don't know which juror it was, because they were all beginning to talk—one of those jurors, ' * * * so that what you are saying is that they are both done by machine.' In other words, this is cross examination of my witness by the jury and the whole jury is now counsel for the plaintiff. That is what I'm up against at this point.

"The Court: I don't think that is true. I may be able to say something to the jury that would not have any prejudicial effect, to the effect they are not to make any questions—to ask any questions until they have raised their hands and been recognized by the Court. I repeat my ruling about the mistrial.

"(Before the jury):

"The Court: I want to caution the jurors now that, while I do my best to have the trial proceed in an orderly course, I cannot always recognize a juror who wishes to be recognized at the moment he or she may first raise their hand, and I will ask you to be patient. I will certainly attempt to get back to you as quickly as possible, but until I do recognize your hand I don't want any juror to speak up. Now, before you proceed further, Mr. Coleman, in an effort, on my part, to keep things in an orderly procedure, I will see if there is any other hand now being raised. Number nine?

"Juror No. 9, Arthur Peters: I would like to ask a question. On that machine thing. Do they mean the flowers are made by machine or hand? That is what I don't quite follow.

"The Court: Does counsel have any objection to the question put by Juror number nine?

"Mr. Coleman: I have no objection, your Honor.

"Mr. Donohue: No objection."

■ Insofar as we are concerned with the trial court's action in permitting respondents' Exhibits B, C, and D to be passed among the jury while appellants' Exhibit No. 2 was being passed among them, we do not believe that the respondents' answer that no timely objection was made is sufficient. It will be recalled that the trial court's action resulted from a request in the form of a question by a juror. Under such circumstances we doubt that an objection is required. Appellants' counsel stated why he made no timely objection, being " * * * for the reason I felt I would be prejudiced because these are questions of jurors, which, to me, are much more important, and call the attention of the other jurors more than the answers of the witness to counsel's questions." That same reasoning was adopted in the case of State v. Sickles, 220 Mo.App. 290, 286 S.W. 432, at page 433, [4], where the court held that no objection was necessary, stating:

" * * * Must counsel take the risk of offending a juror and prejudicing him against counsel's case in order to save the point for review? Suppose he makes an objection and the court sustains it. Will not the juror who asked the question be likely to be offended? The counsel is thus put to the choice of offending a juror by an

objection or letting incompetent testimony go in without objection. If the court asks an improper question, counsel can object and save the point without offending the juror, and can seek redress in a higher court, but he cannot do that when a juror asks an improper question. If he objects to the question and by so doing offends the juror and he loses his case he has no remedy."

However, we do not rule whether or not an objection is necessary for we are cited to no case, and neither are we aware of any that holds such a procedure reversible error. All of these exhibits were then in evidence. Exhibits B, C, and D were the three seat covers allegedly ruined by cutting, and had been received into evidence early in the trial. Exhibit 2, a needlepoint form, was received into evidence immediately before this request by the juror to view all of them together. In view of the contentions of the respondents that the cutting had completely ruined Exhibits B, C, and D, we see no reason why they should not be allowed to view at the same time appellants' Exhibit No. 2, which bore on the appellants' contradictory theory that B, C, and D could be repaired.

■■■ Insofar as the action of the trial court in permitting the jurors to ask questions and in refusing a mistrial because of that permission is concerned, the appellants first contend that the trial judge should not have asked for these questions at the outset. To do so, in appellants' words, "* * * is to invite mistrial and disaster." We cannot agree that the trial court, by its opening remarks regarding the jurors' actions if they did not hear or understand, invited disaster. Surely there can be no prejudicial error in the trial court's action in making sure the jury heard all of the testimony and appellants' real objection goes to that portion of the trial court's remarks as emphasized above. As to that matter, even the appellants admit that it is proper for a juror to ask a question through the trial judge in order to clarify some point in the juror's mind. It has been said that among the trial court's inherent powers in the administration of justice is his power to interrogate witnesses. State v. James, Mo., 321 S.W.2d 698. Of course, a juror is not selected for the purpose of asking questions and can be permitted or denied the privilege by the trial court. When it is permitted him to ask questions, the juror, to some extent at least, represents the court, and the court, because of giving its permission, has permitted the juror to assume the role of counsel and should see to it, without objection being made, that no improper questions are asked of the witness by the juror. State v. Sickles, supra. Just as a judge must be even more cautious in asking questions in a jury case than in one tried before him, State v. James, supra, so must he exercise a corresponding degree of caution with respect to the questions he allows jurors to ask. In the instant case, it is apparent that the trial court relaxed the greater than usual degree of vigilance and control it must exercise when it allows jurors to ask questions, and allowed the questioning by the jurors to get somewhat out of hand, at least at one point during the trial. To the extent that the court interrupted counsel's question to the witness in order to recognize a juror whose raised hand indicated he had a question and allowed another juror to, in effect, cross-examine a witness as to what she had said, we think such activity should be avoided. It clearly defeats the trial court's announced purpose of making sure all the testimony is heard, for who can hear and understand when two or more people are talking at once? Once such a matter gets out of hand, even briefly, it is difficult to stop, and as appellants' counsel stated to the trial court, at one point a somewhat general discussion among the jurors took place. We do not approve of the manner of these questions by jurors at this point in the course of the trial, but the trial court had the best opportunity to evaluate the true effect of such a situation and the other

questions were properly made in an orderly fashion. Moreover, none of the questions dealt with extraneous and immaterial or prejudicial matters, as they did in State v. Sickles, supra. Neither were there any misstatements of the evidence. Even the witness cross-examined by a juror stated that what the juror said was actually the answer she had given. In view of these circumstances, we cannot find that what occurred so influenced this trial as to constitute prejudicial error. We find no merit in appellants' first assignment of error.

■ The appellants next contend that the trial court prejudicially erred in permitting the respondents' expert witness to testify as to the value of the needlepoint seat covers. We do not agree. In Pickett v. Cooper, 354 Mo. 910, 192 S.W.2d 412, at loc. cit. page 417, it was said:

"* * * So, since it is often difficult to determine whether the witness is competent, it is said that the question whether sufficient opportunity to observe, and whether sufficient facts have been related to warrant the receipt of the opinion or inference, rests in the discretion of the trial court; and its action will not ordinarily be reviewed, although it is subject to reversal in extreme cases where an improper exercise of discretion appears. (Citing cases.)"

The appellants are incorrect in stating that the witness had before him a needlepoint seat cover which was not in evidence. He had before him Exhibit A, which had been introduced in evidence. It is true that Exhibit A was not one of the three seat covers which were the subject of this action, but was one of the two covers properly done, but that is precisely what he was asked: to give his opinion of the reasonable market value of an undamaged seat cover, the respondents' theory and evidence being that the three seat covers which are the subject of this action had no value after they were cut by the appellants. Neither do we think that because Tucker

had been out of the hand-done needlepoint business for some three years at the time of trial disqualifies him from expressing his opinion. He testified he had people in his employ who could do such work and he would do it if he were forced to do so by a customer. The jury was entitled to infer from this he was still familiar with that type of work and its value. Nor is he disqualified because upon cross-examination Tucker stated that such work was a labor of love and not done as a commercial item, but had earlier given an opinion as to the reasonable market value. That would go only to the witness's credibility. In view of the nature of the matter here involved, the witness's experience with it, the recitation of facts upon which the witness based his opinion, we cannot say that the trial court abused its discretion in holding that the witness Tucker had superior knowledge of the values of this needlepoint and thus allowing him to so testify.

■ The last assignment of error raised by the appellant is that the action of the trial court in giving Instruction No. 8 was prejudicially erroneous. That instruction reads:

"Instruction No. 8

"The Court instructs the jury that, if you find in favor of the plaintiffs, your verdict should be for the value of the three needlepoint covers at the time defendants cut them."

Respondents' theory was that cutting these seat covers ruined them completely and they were thereafter of no value. The petition alleged

"that upon inspection, plaintiffs discovered that defendants had so carelessly and negligently done the work of affixing the said seat covers to the said three chairs that the said seat covers were ruined by reason of the fact that they had been cut; that the action of the defendants in cutting the said three needlepoint seat covers as aforede-

scribed, completely destroyed and ruined them and caused them to be of no further value; and that the said action on the part of said defendants did further destroy any value of the remaining uncut needlepoint seat covers for the reason that they cannot be matched and those which were ruined and destroyed cannot be replaced."

Tucker, the respondents' expert witness, testified that the reasonable market value of these seat covers in November, 1955, was a minimum of $200 each, and gave the basis for his opinion. Mrs. Sparks testified that as returned to her they had no value. There was therefore testimony of the value before, and the value after the happening alleged to have caused damage, generally the proper measure of damages in cases involving damage to personal property, Baird v. Ellsworth Realty Co., Mo.App., 265 S.W. 2d 770, even though the instruction did not so submit. It is obvious that this instruction does not hypothesize the appellants' theory that, even if they were negligent, which they denied, nevertheless the seat covers could easily and unnoticeably be repaired. It is by now too elemental to require citation that all of the instructions should be read together. Instruction No. 1, the respondents' verdict directing instruction, fully set forth the respondents' theory of this case, as that theory was supported by respondents' evidence. That instruction required the jury to find:

"* * * and if you further find that during the month of November, 1955, plaintiffs delivered to the defendants 3 needlepoint seat covers and 3 dining room chair seats with instructions that the covers should be affixed to the chair seats and with express instructions that the needlepoint seat covers should not be cut, and if you find that defendants accepted the 3 needlepoint seat covers and 3 dining room chair seats to which the covers were to be attached, and if you further find that thereafter the defendants cut the needlepoint seat covers, affixed them to plaintiff's dining room chair seats and returned the chair seats to plaintiffs with the needlepoint covers attached, and that plaintiffs, upon inspecting the upholstering, discovered that the needlepoint covers had been cut by the defendants, and that such cutting was due to the negligence and lack of ordinary care and diligence by the defendants in upholstering the chair seats, if you so find; and if you further find that the needlepoint covers were ruined because of defendants' negligence and lack of ordinary care and diligence, if any, in cutting the needlepoint covers, if so, then your verdict should be for the plaintiffs and against the defendants."

Accordingly, by their verdict in favor of the respondents, the jury found that the needlepoint covers had been destroyed by cutting them and therefore the only issue on damages to be submitted to the jury was the actual value of the needlepoint covers which had been destroyed. It is also significant that the appellants submitted no other instruction to controvert this theory of total destruction and/or submitting their theory that the covers could be easily and unnoticeably repaired. Under these circumstances, the appellants' contention must be overruled.

█ Neither do we think that the instruction was prejudicially erroneous because it sets forth only "value" and not "fair market value" or "reasonable market value." This contention was before the court in Beaty v. N. W. Electric Power Cooperative, Inc., Mo.App., 312 S.W.2d 369, 371, in connection with an instruction referring to "the difference in value" of a fence and some trees. So far as "the difference" is concerned, what we have held just above disposes of the need for any such language in this instruction. In the Beaty case the court held that the instruction was not prejudicially erroneous because some qualifying word such as "actual" or "reasonable" or "fair" did not precede the word

"value." The difference in meaning, if there is any, between "value" and "actual value" or "reasonable value" or "fair value" is so tenuous the requirement of those words in this instruction could, under the facts of this case, only result in confusing the jury. We find no prejudicial error in the giving of Instruction No. 8.

The judgment should be affirmed. The Commissioner so recommends.

PER CURIAM.

The foregoing opinion by BRADY, C., is adopted as the opinion of the Court. The judgment is therefore affirmed.

ANDERSON, P. J., WOLFE, J., and SAM C. BLAIR, Special Judge, concur.

RUDDY, J., not participating.