35 P.3d 233

STATE of Hawai'i, Plaintiff–Appellee,

v.

Timothy J. CULKIN, Defendant–Appellant.

No. 22394.

Supreme Court of Hawai'i.

Nov. 30, 2001.

As Amended Dec. 6, 2001.

Deborah L. Kim, Deputy Public Defender, for defendant-appellant.

Caroline M. Mee, Deputy Prosecuting Attorney, for plaintiff-appellee.

Opinion of the Court by RAMIL, J.

Defendant-appellant Timothy J. Culkin ("Culkin") appeals from a first circuit court jury trial, the Honorable Melvin K. Soong presiding, convicting Culkin of reckless manslaughter, in violation of Hawai'i Revised Statutes (HRS) § 707–702(1)(a) (1993 &

Supp.2000),[1] and reckless endangering in the second degree, in violation of HRS § 707–714 (1993).[2] Culkin is currently serving an indeterminate term of twenty years of incarceration and a concurrent term of one year.

On appeal, Culkin raises the following points of error: (1) the circuit court committed plain error by giving confusing and misleading instructions to the jury, instructions that failed to include a "self-defense-as-justification-for-reckless-manslaughter" instruction; (2) the circuit court erred by allowing the prosecution to impeach Culkin with pending forgery charges, thus forcing him to assert his fifth amendment privilege in front of the jury; (3) the circuit court erred by excluding evidence relevant to Culkin's self-defense position; (4) the juror questioning violated evidentiary rules and Culkin's right to a fair trial; and (5) the circuit court erred by excluding Culkin's father from the courtroom because of the prosecution's "impromptu" designation of him as a rebuttal witness.

■ We hold that the jury instructions were prejudicially misleading, prejudicially

confusing, and likely contributed to the reckless manslaughter conviction. Accordingly, we vacate Culkin's conviction of and sentence for the offense of reckless manslaughter.[3] To provide guidance on remand, we address Culkin's remaining points of error. *Cf. State v. Davia*, 87 Hawai'i 249, 252, 953 P.2d 1347, 1350 (1998). In so doing, we further hold: (1) that, under the circumstances of this case, the circuit court abused its discretion by permitting the prosecution to cross-examine Culkin about multiple false identification cards discovered at his house with foreknowledge that Culkin intended to invoke his fifth amendment privilege if questioned about them; and (2) that the circuit court erred by concluding that the prior reckless use by his brother, Thomas Culkin, of a .44 caliber revolver was not relevant to the reasonableness of Culkin's apprehension of danger on the morning of July 27, 1997. Culkin's remaining points of error are without merit.

## I. *BACKGROUND*

The prosecution charged Culkin with committing murder in the second degree, in vio-

---

1. HRS § 707–702 (1993 & Supp.2000) provides that:

 **§ 707–702 Manslaughter.** (1) A person commits the offense of manslaughter if:

 (a) He recklessly causes the death of another person; or

 (b) He intentionally causes another person to commit suicide.

 (2) In a prosecution for murder in the first and second degrees it is a defense, which reduces the offense to manslaughter, that the defendant was, at the time he caused the death of the other person, under the influence of extreme mental or emotional disturbance for which there is a reasonable explanation. The reasonableness of the explanation shall be determined from the viewpoint of a person in the defendant's situation under the circumstances as he believed them to be.

 (3) Manslaughter is a class A felony.

2. HRS § 707–714 (1993) provides that:

 **§ 707–714 Reckless endangering in the second degree.** (1) A person commits the offense of reckless endangering in the second degree if the person engages in conduct which recklessly places another person in danger of death or serious bodily injury.

 (2) For purposes of this section and in addition to other applications, a person engages in conduct which recklessly places another person in danger of death or serious bodily injury when that person intentionally discharges a firearm in

a populated area, in a residential area or within the boundaries or in the direction of any road, street or highway; provided that the provisions of this paragraph shall not apply to any person who discharges a firearm upon a target range for the purpose of the target shooting done in compliance with all laws and regulations applicable thereto.

 (3) Reckless endangering in the second degree is a misdemeanor.

3. Culkin's arguments on appeal relate primarily, if not exclusively, to his reckless manslaughter conviction. A person commits the offense of reckless endangering in the second degree if the person discharges a firearm in a populated or residential area. HRS § 707–714(2); *see supra* note 2. During Culkin's case-in-chief, Culkin testified that he discharged a firearm into the air. As such, the jury's determination that Culkin was guilty of this crime, unlike the reckless manslaughter verdict, did not turn upon an assessment of Culkin's credibility. Our conclusion in section III.B.1, *infra*, that the circuit court abused its discretion by permitting the prosecution to impeach Culkin with evidence of multiple false identifications does not mandate that Culkin's conviction of reckless endangering be vacated. Inasmuch as both the prosecution and the defense appear to have agreed that Culkin discharged a firearm in a populated residential area, the circuit court's error was harmless beyond a reasonable doubt.

lation of HRS § 707–701.5 (1993), and reckless endangering in the second degree, in violation of HRS § 707–714 (1993).

On the morning of July 27, 1997, a police officer responding to a disturbance in a residential area of 'Aiea, in the City and County of Honolulu, encountered Jayne Suarez ("Suarez") kneeling in front of a house and Culkin walking across the front yard carrying what appeared to be a rifle case. Culkin notified the officer that his brother was unconscious inside the house. The officer discovered Thomas Culkin ("Thomas") lying on the upstairs floor. Thomas was transported to Pali Momi hospital and pronounced dead shortly after his arrival. An autopsy revealed the cause of death to be injury to the heart from a stab wound to the chest.

Suarez later testified that she went with Thomas to the residence, which she knew to be Culkin's house, early that morning. After entering the house through a back door, Suarez went into a bedroom. Shortly thereafter, she heard footsteps from upstairs. Culkin appeared and looked into the room. Upon seeing Suarez, Culkin turned to Thomas, who was outside the bedroom, and began to yell about "[w]hy he brought somebody over and that—that he didn't keep his promise about not bringing anybody over [to] the house[.]" Thomas responded by swearing and yelling at Culkin. The verbal argument soon escalated into a physical altercation.

From her vantage point, Suarez saw the brothers grapple past the bedroom doorway. They rolled to the ground. Culkin attempted to stop the fight by calling out for Thomas to "stop, stop already." Shortly thereafter, the brothers broke apart. Thomas continued to push and swear at Culkin, attempting to instigate further fighting. Culkin turned and walked up a flight of stairs leading to the second story of the house. Thomas quickly followed. Suarez could hear the brothers continue to yell at each other upstairs. Culkin repeatedly yelled at Thomas to leave the house. Suarez then heard a loud scream followed by "I can't believe you did this to me."[4] Culkin again said, "I want you guys out of my house" and came downstairs armed

with a handgun. He said "beat it, bitch" to Suarez, who promptly ran out of the house. Culkin followed her and fired the pistol into the air when she reached the rear gate.

Culkin testified that, upon discovering Suarez inside of the. house, he became very angry with Thomas. Approximately two weeks earlier, Culkin had offered Thomas a bedroom at the house on the condition that Thomas promise that he would not bring any of his friends over. Culkin explained that Thomas's friends were "drug addicts, excons, thieves." Culkin knew Suarez to be "a thief and an ice addict."

According to Culkin, Thomas suddenly and unexpectedly charged at him. The brothers had fought before, "[b]ut not like this. It was real intense[.]" Culkin eventually escaped and ran up the stairs towards the kitchen. Culkin grabbed a small knife sitting on a counter, exited the kitchen, and stopped in the hallway in front of his bedroom.

Culkin testified that "I figure okay, if I show him the knife, he would stop. He would, you know, go away." When asked what he thought Thomas intended, Culkin explained:

> I thought he was going to either kill me or seriously really hurt me 'cause it was like—we had been in fights before. But this was different. He was strong. I mean, when I threw him against the wall, it doesn't even phase him.... He just got more mad.... He was going for blood. He was going for my throat, my eyes. He was going for anything that he could do.

However, Culkin testified that even after seeing the knife, Thomas charged at him. He said, "I could like see [Thomas] make a decision like I'm going to charge him, forget the knife." Thomas grabbed Culkin's throat. Culkin stabbed around or under Thomas's arms, with no effect. Culkin then stabbed twice towards Thomas's stomach, stopping the attack.

Culkin testified that he then went into his bedroom to grab a .44 caliber revolver that belonged to Thomas. He explained that he persuaded Thomas to let him hold on to the

---

4. Suarez testified that she heard Thomas say "I can't believe you did this to me." However, Culkin claimed that it was he who made the statement.

gun after witnessing Thomas repeatedly use the weapon in a reckless and threatening manner. However, he had notified Thomas that, "[i]n case you ever need it, it's right here, it's in my room." Culkin explained that his primary concern was simply to get the weapon "away" from Thomas.

After obtaining the pistol, Culkin heard noise downstairs and chased Suarez out of the house. He then returned to his bedroom to remove his "gun case." Culkin testified that he did not stop to check on Thomas at that time because "I had no idea he was hurt that bad." Culkin testified that he intended to place the gun case inside his garage and then return to check on Thomas. The police arrived while Culkin was outside with the gun case.

At trial, a toxicologist testified that Thomas's blood contained, among other substances, 3.66 milligrams of methamphetamine per liter of blood. According to the toxicologist, it would be "highly unusual" for a person to have this level of methamphetamine in their system and still be "walking around." An expert in the field of methamphetamine intoxication and analysis testified that the level of methamphetamine in Thomas's blood greatly exceeded the lethal dose for a person of Thomas's size.

## II. *STANDARDS OF REVIEW*

### A. *Jury Instructions*

■ When jury instructions or the omission thereof are at issue on appeal, the standard of review is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading.

Erroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial.

Error is not to be viewed in isolation and considered purely in the abstract. It must be examined in the light of the entire proceedings and given the effect which the whole record shows it to be entitled. In that context, the real question becomes whether there is a reasonable possibility

that error may have contributed to conviction. If there is such a reasonable possibility in a criminal case, then the error is not harmless beyond a reasonable doubt, and the judgment of conviction on which it may have been based must be set aside.

*State v. Gomes*, 93 Hawai'i 13, 18, 995 P.2d 314, 319 (2000) (citations, internal quotation signals, and brackets omitted).

### B. *Plain Error*

■ "We may recognize plain error when the error committed affects substantial rights of the defendant." *Gomes*, 93 Hawai'i at 18, 995 P.2d at 319 (citing *State v. Cullen*, 86 Hawai'i 1, 8, 946 P.2d 955, 962 (1997)); *see also* Hawai'i Rules of Penal Procedure (HRPP) Rule 52(b) (1993) ("Plain error or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.").

### C. *Admissibility of Evidence*

■ We apply two different standards of review in addressing evidentiary issues. Evidentiary rulings are reviewed for abuse of discretion, unless application of the rule admits of only one correct result, in which case review is under the right/wrong standard.

*State v. Ortiz*, 91 Hawai'i 181, 189, 981 P.2d 1127, 1135 (1999) (citations and internal quotation signals omitted). "An abuse of discretion occurs if the trial court has clearly exceeded the bounds of reason or has disregarded rules or principles of law or practice to the substantial detriment of a party litigant." *State v. Lee*, 90 Hawai'i 130, 134, 976 P.2d 444, 448, *cert. denied*, 528 U.S. 821, 120 S.Ct. 65, 145 L.Ed.2d 56 (1999) (citations and internal quotation signals omitted).

## III. *DISCUSSION*

### A. *The Circuit Court's Jury Instructions Were Prejudicially Inconsistent and Misleading.*

Culkin contends that the circuit court erred by issuing jury instructions that did not include, as an element of reckless manslaughter, an instruction that the prosecution had the burden of proving that Culkin did

not act in self-defense. This failure, Culkin alleges, when considered with the general justification instruction suggesting that the prosecution did have such a burden, resulted in jury instructions that were misleading, confusing, and likely contributed to his conviction.

 Initially, we note that Culkin did not object to the instruction at trial. "Ordinarily, instructions to which no objection was made at trial may not be raised as error on appeal." *State v. Pinero*, 75 Haw. 282, 291, 859 P.2d 1369, 1374 (1993) (*Pinero II*); *see* Hawai'i Rules of Penal Procedure (HRPP) Rule 30(f). Where an erroneous instruction affected the substantial rights of a defendant, however, "we may notice the error as 'plain error' and remand for corrective action." *Pinero II*, 75 Haw. at 292, 859 P.2d at 1374 (citation and emphasis omitted).

 Criminal defendants are entitled to jury instructions on every defense or theory of defense having any support in the evidence. *State v. Agrabante*, 73 Haw. 179, 196, 830 P.2d 492, 501 (1992) (quoting *State v. O'Daniel*, 62 Haw. 518, 527–28, 616 P.2d 1383, 1390 (1980)). The record contains evidence supporting Culkin's contention that he acted in self-defense when he stabbed Thomas. Accordingly, Culkin was entitled to self-defense jury instructions. *Id.*

The circuit court instructed the jury regarding the elements of murder in the second degree and the lesser included offense of reckless manslaughter, as well as first, second and third degree assault.[5] For each offense, except reckless manslaughter, the circuit court instructed the jury that the prosecution bore the burden of proving that Culkin did not act in self-defense. With respect to reckless manslaughter, however, the instructions advised that the prosecution need prove only that Culkin recklessly caused the death of Thomas. The circuit court also issued a general justification instruction that self-defense "is a defense to all offenses brought before the Defendant in this case." [6] Culkin contends that these instructions, considered as a whole, were erroneous and misleading.

 With respect to the adequacy of jury instructions, this court has explained:

[T]he trial court is the sole source of all definitions and statements of law applicable to an issue to be resolved by the jury. Moreover, it is the duty of the circuit judge to see to it that the case goes to the jury in a clear and intelligent manner, so that they may have a clear and correct understanding of what it is they are to decide, and he or she shall state to them fully the law applicable to the facts. And faced with inaccurate or incomplete instructions, the trial court has a duty to, with the aid of counsel, either correct the defective instructions or to otherwise incorporate it into its own instructions. In other words, the ultimate responsibility properly to instruct the jury lies with the circuit court and not with trial counsel.

---

5. The question whether first, second, and third degree assault are lesser included offenses of murder in the second degree was not raised on appeal. Accordingly, we leave that determination for another day.

6. The circuit court generally instructed the jurors, with respect to justification, as follows:

Justifiable use of force—commonly known as self-defense—is a defense to all offenses brought before the Defendant in this case. The burden is on the prosecution to prove beyond a reasonable doubt that the force used by the Defendant was not justifiable. If the prosecution does not meet its burden, you must find the Defendant not guilty.

The use of force upon or towards another person is justified when a person reasonably believes that such force is immediately necessary to protect himself on the present occasion against the use of unlawful force by the other person. The reasonableness of the Defendant's belief that the use of such protective force was immediately necessary shall be determined from the viewpoint of a reasonable person in the Defendant's position under the circumstances of which the Defendant was made aware or as the Defendant reasonably believed them to be.

The use of deadly force upon or towards another person is justified when a person using such force reasonably believes that deadly force is immediately necessary to protect himself on the present occasion against death or serious bodily injury. The reasonableness of the Defendant's belief that the use of such protective force was immediately necessary shall be determined from the viewpoint of a reasonable person in the Defendant's position under the circumstances of which the Defendant was aware or as the Defendant reasonably believed them to be.

*State v. Kinnane,* 79 Hawai'i 46, 50, 897 P.2d 973, 977 (1995) (citations, footnotes, internal quotation signals, and brackets omitted).

### 1. *Self-defense and reckless manslaughter*

■ Justification, which includes self-defense, subject to limitations set forth in HRS chapter 703 (1993), is a defense in any prosecution for an offense. HRS § 703–301(1) (1993). Self-defense is not an affirmative defense, and the prosecution has the burden of disproving it once evidence of justification has been adduced. HRS § 702–205(b) (1993) (prosecution's burden of proof beyond a reasonable doubt includes negativing relevant non-affirmative defenses); *see also State v. Lubong,* 77 Hawai'i 429, 431, 886 P.2d 766, 768 (App.1994).

■ Culkin was charged with, and testified to, inflicting numerous stab wounds upon Thomas with a kitchen knife. HRS § 703–300 (1993) defines "deadly force" to include "force which the actor knows to create a substantial risk of causing death or serious bodily harm." Culkin's conduct thus constituted deadly force. *See Lubong,* 77 Hawai'i at 432, 886 P.2d at 769.

The use of deadly force is justified only "if the actor believes that deadly force is necessary to protect himself against death, serious bodily injury, kidnapping, rape, or forcible sodomy." HRS § 703–304(2) (1993).[7] HRS § 703–300 defines "believes" as "reasonably believes." The Supplemental Commentary to HRS § 703–300 (1993) explains that:

> The definition adopts "the reasonable man standard with respect to justification for the use of force in self-protection, in the

protection of property, and in the protection of others. It is your Committee's finding that the requirement that a person's belief be "reasonable" for these defenses to be available will provide an *objective basis* by which to gauge whether or not the use of force was justified."

(Citation omitted and emphasis added.)

■ The test for assessing a defendant's self-protection defense thus involves two prongs.

> The first prong is subjective; it requires a determination of whether the defendant had the requisite belief that deadly force was necessary to avert death, serious bodily injury, kidnapping, rape, or forcible sodomy.
>
> . . . .
>
> If the State does not prove beyond a reasonable doubt that the defendant did not have the requisite belief that deadly force was necessary, the factfinder must then proceed to the second prong of the test. *People v. Goetz,* 68 N.Y.2d 96, 114, 506 N.Y.S.2d 18, 29, 497 N.E.2d 41, 52 (1986). This prong is objective; it requires a determination of whether a reasonably prudent person in the same situation as the defendant would have believed that deadly force was necessary for self-protection. *Id.*

*Lubong,* 77 Hawai'i at 433, 886 P.2d at 770.

### 2. *The prosecution's arguments*

In response to Culkin's claim of error, the prosecution appears to contend that self-defense is not a defense to reckless manslaughter. The prosecution argues, for example, that "[i]t would have been error for the lower

---

7. HRS § 703–304(5) additionally instructs in relevant part that:

(5) The use of deadly force is not justifiable under this section if:
(a) The actor, with the intent of causing death or serious bodily injury, provoked the use of force against himself in the same encounter; or
(b) The actor knows that he can avoid the necessity of using such force with complete safety by retreating or by surrendering possession of a thing to a person asserting a claim of right thereto or by complying with a demand that he abstain from any action which he has no duty to take, except that:

(i) The actor is not obliged to retreat from his dwelling or place of work, unless he was the initial aggressor or is assailed in his place of work by another person whose place of work the actor knows it to be; and
(ii) A public officer justified in using force in the performance of his duties, or a person justified in using force in his assistance or a person justified in using force in making an arrest or preventing an escape, is not obliged to desist from efforts to perform his duty, effect the arrest, or prevent the escape because of resistance or threatened resistance by or on behalf of the person against whom the action is directed.

court to require the [prosecution] to disprove self-defense as an element of manslaughter because, if the self-defense was reckless, it did not absolve Defendant of liability." As support for this argument, the prosecution cites HRS § 703–310 (1993), which provides as follows:

> **Provisions generally applicable to justification.** (1) When the actor believes that the use of force upon or toward the person of another is necessary for any of the purposes for which such a belief would establish a justification under sections 703–303 to 703–309 but the actor is reckless or negligent in having such belief or in acquiring or failing to acquire any knowledge or belief which is material to the justifiability of the actor's use of force, the justification afforded by those sections is unavailable in a prosecution for an offense for which recklessness or negligence, as the case may be, suffices to establish culpability.

▇▇ Rather than instructing that self-defense is not a defense to reckless manslaughter, HRS § 703–310 quite plainly instructs that self-defense is not available as justification where a defendant believes that the use of force is necessary, but is reckless or negligent in so believing.[8] *See State v. Nupeiset*, 90 Hawai'i 175, 186, 977 P.2d 183, 194 (App. 1999) (citing Commentary to HRS § 703–310). HRS § 703–310, read in *pari materia* with HRS §§ 703–300 and 703–304, thus reflects the legislature's decision to limit the availability of self-defense as justification to situations in which the defendant's subjective belief that self-defense was necessary is objectively reasonable. *See* Supplemental Commentary to HRS § 703–300.

▇▇ The prosecution's argument that self-defense is not a defense to reckless man-

slaughter is also inconsistent with basic principles of the Hawai'i Penal Code. HRS § 703–301 instructs that justification, as defined in §§ 703–302 through 703–309, is a defense in any prosecution for an offense. Reckless manslaughter is unquestionably an offense. HRS § 707–702(1) ("A person commits the *offense* of manslaughter if . . .") (emphasis added). HRS § 702–205 (1993) identifies the elements of an offense to be

such (1) conduct, (2) attendant circumstances, and (3) results of conduct, as:

(a) Are specified by the definition of the offense, and

(b) *Negative a defense* (other than a defense based on the statute of limitations, lack of venue, or lack of jurisdiction).

(Emphasis added.) The absence of justification is thus an attendant circumstances element of all offenses with which Culkin was charged that related to the death of Thomas.[9] *Id.; see also* Wayne R. LaFave & Austin W. Scott, Jr. *Substantive Criminal Law* § 1.2(c) (1986 & Supp.2001) ("Perhaps we might say that in criminal homicide and battery an attendant circumstance necessary for guilt is the absence of any justification or excuse.").

HRS § 701–114 (1993) specifies that "no person may be convicted of an offense unless . . . [t]he state of mind required to establish each element of the offense" is proven beyond a reasonable doubt. Similarly, HRS § 702–204 (1993) instructs that "a person is not guilty of an offense unless the person acted intentionally, knowingly, recklessly, or negligently, as the law specifies, with respect to each element of the offense." Culkin was convicted of reckless manslaughter, which requires a reckless state of mind. HRS § 707–702. "When the law provides that recklessness is sufficient to establish an element of

---

8. The jury was adequately instructed in this regard that:

> If and only if you find that the defendant was reckless in having a belief that he was justified in using self-protective force against another person, or that the defendant was reckless in acquiring or failing to acquire any knowledge or belief which was material to the justifiability of his use of force against the other person, then the use of such self-protective force is unavailable as a defense to the offenses of

Manslaughter, Assault in the Second Degree based on reckless conduct, and Assault in the Third Degree based on reckless conduct.

9. The absence of justification would not, of course, be an attendant circumstance that must be proven by the prosecution beyond a reasonable doubt where the record is devoid of evidence that the defendant acted in self-defense and the defendant is therefore not entitled to jury instructions in that regard. HRS § 702–205.

an offense, that element is also established if, with respect thereto, a person acts intentionally or knowingly." HRS § 702-208 (1993). Accordingly, the prosecution could establish the requisite mental state with respect to the attendant circumstances element of reckless manslaughter by proving that Culkin acted with an intentional, knowing, or reckless state of mind. HRS § 702-206 (1993) explains in relevant part that:

A person acts *intentionally* with respect to attendant circumstances when he is aware of the existence of such circumstances or believes or hopes that they exist.

. . . .

A person acts *knowingly* with respect to attendant circumstances when he is aware that such circumstances exist.

. . . .

A person acts *recklessly* with respect to attendant circumstance when he consciously disregards a substantial and unjustifiable risk that such circumstances exist.

(Emphasis added.) The prosecution could thus establish the requisite mental state with respect to the attendant circumstances element of reckless manslaughter by proving beyond a reasonable doubt that Culkin acted (1) with awareness, belief, or hope that deadly force was not necessary to protect himself against death or serious bodily injury (intentional state of mind); (2) with awareness that deadly force was not necessary to protect himself against death or serious bodily injury (knowing state of mind); or (3) in conscious disregard of a substantial and unjustifiable risk that deadly force was not necessary to protect himself from death or serious bodily injury (reckless state of mind).

Ultimately, the jury's determination as to whether Culkin was justified in using deadly force turns upon the *objective reasonableness* of Culkin's subjective belief that deadly force was necessary to protect himself from death or serious bodily injury. *Lubong,* 77 Hawai'i at 433, 886 P.2d at 770. If the jury concluded that a reasonable person in Culkin's position, and under the circumstances as he believed them to be, would believe that deadly force was necessary to protect himself from death or serious bodily injury, Culkin's use of

deadly force was justified. HRS §§ 703-300 and 703-304(2).

### 3. *The jury instructions in this case*

Turning to the instructions issued to the jury in this case, the circuit court advised the jury with respect to murder in the second degree as follows:

There are three material elements of the offense of Murder in the Second Degree, each of which the prosecution must prove beyond a reasonable doubt.

These three elements are:

1. That, on or about July 27, 1997, in the City and County of Honolulu, State of Hawai'i, the Defendant, Timothy Culkin, caused the death of Thomas Culkin; and

2. That the Defendant did so intentionally or knowingly; and

3. That the Defendant did so without justification; in other words, that the Defendant did not do so in self-defense.

The trial court then instructed that "[i]f and only if you find the defendant not guilty of Murder in the Second Degree, or you are unable to reach a unanimous verdict as to Murder in the Second Degree, then you must determine whether the defendant is guilty or not guilty of the offense of Manslaughter based upon reckless conduct."

Because the jury obviously reached the reckless manslaughter charge, either (1) the jury was unable to reach a unanimous verdict as to murder in the second degree, or (2) the jury determined that Culkin was not guilty of murder in the second degree. It is entirely possible that the jury concluded that Culkin was justified in using deadly force, *see Lubong,* 77 Hawai'i at 433, 886 P.2d at 770, and acquitted him of second degree murder on that basis.

██ One obvious problem with the foregoing instruction is that if the jury concluded that Culkin was justified in using deadly force, he was entitled by law to an acquittal of *all* charges against him relating to the stabbing of Thomas. *See* HRS §§ 703-301(1) and 703-304(2). The instructions given by the trial court, however, advised the jurors to proceed to the reckless manslaughter charge.

On the other hand, the second degree murder instruction would not be problematic if the reckless manslaughter instruction was not itself erroneous. The reckless manslaughter instruction reads simply that:

> There are two material elements of [the offense of reckless manslaughter], each of which the prosecution must prove beyond a reasonable doubt.
>
> These two elements are:
>
> 1. That the defendant caused the death of Thomas Culkin; and
> 2. That the defendant did so recklessly.

In this case, however, there were in fact three material elements of the offense of reckless manslaughter. *See* HRS § 702–205. The prosecution was also required to prove beyond a reasonable doubt that Culkin was not justified in using deadly force when he stabbed Thomas. *Id.*

As an aside, the erroneous reckless manslaughter instruction may have been harmless if the trial court had issued an instruction like that given in *Pinero II*. The defendant in *Pinero II* was charged with murder in the first degree, in violation of HRS § 707–701(1)(b) (Supp.1992), in connection with the death of a police officer. The jury instruction on the lesser included offense of reckless manslaughter was virtually identical to that given in this case; *i.e.,* the jurors were not advised that the prosecution was also required to prove that the defendant was not justified in using deadly force to defend himself. *Pinero II,* 75 Haw. at 294, 859 P.2d at 1375. However, the jurors in *Pinero II* were also instructed that:

> In order to find the defendant guilty of Murder in the First Degree or Manslaughter (due to extreme mental or emotional disturbance) or reckless Manslaughter, you must determine whether or not the defense of Self Defense applies.

*Id.* at 295, 859 P.2d at 1375–76. In fact, one of the issues on appeal in *Pinero II* involved

the accidental omission of the underscored language from the following instruction: [10]

> If you find that the Defendant acted in Self Defense, then you must find him Not Guilty. If you find that he did not act in Self Defense, then you must find him guilty of either Murder in the First Degree or Manslaughter (due to extreme mental or emotional disturbance for which there is a reasonable explanation), *or manslaughter based on reckless conduct,* depending on your determination of his state of mind.

*Id.* at 290, 859 P.2d at 1373–74.

In this case as well, if the jurors found that the defendant acted in self-defense, they should have acquitted him of all offenses. However, the circuit court's instructions were ambiguous in this respect. Particularly problematic is the circuit court's instruction that "[i]f the prosecution [proves beyond a reasonable doubt that Culkin recklessly caused the death of Thomas], then you *must* return a verdict of guilty of manslaughter based upon reckless conduct."

The prosecution maintains that the jury instructions were not misleading because the trial court issued a general justification instruction informing the jurors that self-defense was a defense to "any and all" offenses. Specifically, the circuit court advised the jurors that self-defense

> is a defense to any and all offenses brought against the Defendant in this case. The burden is on the prosecution to prove beyond a reasonable doubt that the force used by the defendant was not justifiable. If the prosecution[ ] does not meet its burden then you must find the defendant not guilty.

However, we cannot agree that this self-defense instruction rendered the reckless manslaughter instruction harmless.

To the contrary, as a result of the foregoing, the jurors confronted seemingly contra-

---

10. The court in *Pinero II* concluded that:

the trial court did not commit plain error as a result of the typographical omission in [the] instruction ... because the instructions as a whole, the verdict forms and the other information before the jury were sufficient to pro-

vide it with the option of finding Pinero guilty of reckless manslaughter as opposed to murder in the first degree.

75 Haw. at 296–97, 859 P.2d at 1376 (citation omitted).

dictory instructions. On one hand, the instructions appear to require the jurors to find Culkin guilty of reckless manslaughter if he recklessly caused the death of Thomas. On the other hand, the instructions advise that self-defense is a defense to "any and all offenses" brought against Culkin. Confusion was likely compounded by the fact that the jury instructions with respect to second degree murder, first degree assault, second degree assault, and third degree assault required the prosecution to disprove that Culkin was justified in using deadly force. Reckless manslaughter was the sole offense for which the jurors were not advised that the prosecution had any burden in this regard.

Under these circumstances, it is not surprising that the jurors sought clarification from the trial court. The jurors inquired what the court meant when it said that self-defense was a defense to "any and all offenses[.]" The circuit court responded: "Please refer to the Court's written instructions which have been provided. You may also use your common sense."

█ The circuit court has a duty to correct defective instructions and ensure that the case goes to the jury in a clear and intelligent manner. *Kinnane,* 79 Hawai'i at 50, 897 P.2d at 977. Inasmuch as it was the court's written instructions that engendered the uncertainty, referring the jurors back to those instructions likely did little to address the jury's concerns. For the foregoing reasons, we hold that the jury instructions were inconsistent and misleading.

There is a reasonable possibility that the misleading jury instructions contributed to Culkin's conviction of reckless manslaughter. There was evidence of juror confusion as to whether self-defense was a defense to reckless manslaughter. The jury instructions are inconsistent in this regard. And Culkin was, in fact, convicted of reckless manslaughter. Accordingly, we hold that the circuit court committed plain error and Culkin's conviction must be set aside. *See State v. Arceo,* 84 Hawai'i 1, 11–12, 928 P.2d 843, 853–54 (1996)

(quoting *State v. Holbron,* 80 Hawai'i 27, 32, 904 P.2d 912, 917 (1995)) (citation omitted).

We thus vacate the circuit court's judgment of conviction of and sentence for reckless manslaughter, in violation of HRS § 707–702(1)(a), and remand the present matter to the circuit court for further proceedings consistent with this opinion. Although this issue is outcome-dispositive of the instant appeal, we address Culkin's remaining points of error in order to provide guidance to the circuit court and the parties on remand. *Cf. State v. Davia,* 87 Hawai'i 249, 252, 953 P.2d 1347, 1350 (1998).

### B. *The Circuit Court's Evidentiary Rulings*

1. *The circuit court abused its discretion by permitting the prosecution to cross-examine Culkin regarding the second Harold Cross and the Paul Polinski identifications.*

A police search of Culkin's house uncovered a number of forged identifications.[11] In connection with this discovery, Culkin was charged with one count of second degree forgery, and was scheduled for trial on that charge after the murder trial. The prosecution filed a motion indicating its intent to confront Culkin with evidence: (1) of a checking account with the Bank of Hawai'i that Culkin allegedly opened using the name of Harold Cross; (2) that, in May 1997, Culkin used that same name to rent his house; and (3) of several identification cards discovered during the search of Culkin's house. Defense counsel objected on the grounds that Culkin was facing an upcoming forgery trial based on the opening of a checking account under the name Harold Cross. She argued that to question Culkin on this matter would potentially force him to assert his fifth amendment privilege in front of the jury, which would be "extremely prejudicial." The circuit court ruled that if Culkin took the stand, the prosecution could question him about use of the State "Harold Cross" identification to open the bank account and to rent

---

11. The search of Culkin's house uncovered identification cards with Culkin's photographs inserted into them, blanks used for drafting false iden-

tification cards for driver's licenses, insurance cards, identification cards for government agencies, and even passports.

the house, but precluded questioning about other identification cards.

At trial, Culkin took the stand and testified that he used the name "Harold Cross," who was a real person, to open a checking account and rent the house in which he lived. Culkin explained that he used the Harold Cross identification because he wanted a house big enough to start up a printing business, but that his own credit was bad. During Culkin's testimony, the following exchange occurred:

Q. [by Prosecutor] Do you remember doing this, making this ID card?

A. [by Culkin] Yes.

Q. Do you remember putting six foot tall, 225 pounds?

A. I remember sitting for the picture. I didn't fill out the ID, though. But— (shrugs)

Q. You did not fill out the ID. Who filled out the ID?

A. My brother made the ID, typed in all the information.

Q. Your brother makes your ID to rent the house, to open the bank account—

. . . .

Q. Did you say in your answer your brother made this ID for you?

A. I said my brother made the ID for me, yes.

Q. All you did was sit for the picture?

A. Right.

The circuit court then ruled that Culkin had opened the door for the prosecution to impeach him with evidence that he also possessed other identification cards. Culkin advised the court that, due to the pending forgery trial, he would invoke his fifth amendment privilege if questioned about other identifications. Nevertheless, the court permitted the prosecution to question Culkin about a federal identification under the name Harold Cross and a state identification under the name Paul Polinski. In response to questions, Culkin asserted his privilege against self-incrimination six times.[12] The trial court cautioned the jury to "not draw any inference prejudicial to the defendant by his choosing to exercise his Fifth Amendment rights." Culkin contends that the circuit court abused its discretion by permitting the prosecutor to cross-examine him regarding false identification cards uncovered at his house, thereby forcing him to invoke his fifth amendment privilege on the witness stand. We agree.

▬▬▬ "A defendant who elects to testify in his own defense is subject to cross-examination as to any matter pertinent to,

12. The following exchange occurred:

Q. [prosecutor]: Yesterday, you told all the jurors here that your reason for using a false identification card was so you could just rent a house; isn't that correct?
A. [Culkin]: Upon advice of my counsel and based upon my Fifth Amendment right I respectfully decline to answer that question.
Q. I'm going to show you exhibit 107, Mr. Culkin. Isn't it true that this card marked State's Exhibit 107 is the card that you used to open the bank account under a false name and to rent a house under a false name of Harold D. Cross?
A. Upon the advice of my counsel and based upon my Fifth Amendment right I respectfully decline to answer that question.
Q. Isn't it true that on the day that you stabbed your brother you had both this identification card, state ID for Harold D. Cross with your picture on it as well as this State of Hawai'i identification card with the name of Paul Polinski, address 2550 Kuhio Avenue, a different social security number 455–22–5033 and a different date of birth 10/12/54 in your wallet in your room and upon your bed.

A. Upon advice of my counsel and based upon my Fifth Amendment right I respectfully decline to answer that question.
. . .
Q. Isn't it true, Mr. Culkin, that in this false identification card with your picture and Paul Polinsky on it you are wearing different clothes?
A. Upon the advice of my counsel and based upon my Fifth Amendment right I respectfully decline to answer that question.
Q. Isn't it true, Mr. Culkin, that in your briefcase in your bedroom on the date you stabbed your brother you also had a false identification card entitled federal emergency management agency federal employee heavy equipment operator under the name of Harold D. Cross?
A. Upon advice of my counsel and based upon my Fifth Amendment right I respectfully decline to answer that question.
. . . .
Q. These are your photos, aren't they, Mr. Culkin?
A. Upon advice of my counsel and based upon my Fifth Amendment right I respectfully decline to answer that question.

or having a logical connection with the specific offense for which he is being tried." *State v. Pokini*, 57 Haw. 17, 22, 548 P.2d 1397, 1400 (1976). In this regard, a defendant "may be cross-examined on collateral matters bearing upon his credibility, the same as any other witness." *State v. Napulou*, 85 Hawai'i 49, 57, 936 P.2d 1297, 1305 (App.1997) (citing *Pokini*, 57 Haw. at 22, 548 P.2d at 1400). Hawai'i Rules of Evidence (HRE) Rule 608(b) (1993) instructs in relevant part that "[s]pecific instances of the conduct of a witness, for the purpose of attacking the witness' credibility, if probative of untruthfulness, may be inquired into on cross-examination of the witness and, in the discretion of the court, may be proved by extrinsic evidence." While HRE Rule 608 invests the trial judge with discretion to admit extrinsic evidence, the HRE Rule 403 balancing test will dictate exclusion of that extrinsic evidence in certain cases. HRE Rule 608–1992 Supplemental Commentary; *see also* Addison M. Bowman, Hawai'i Rules of Evidence Manual § 608–2B(2) (2d ed.1998).

 Initially, the circuit court did not abuse its discretion by permitting the prosecution to question Culkin about the state Harold Cross identification.[13] Inasmuch as there were no witnesses to the stabbing, this case turned in large part on Culkin's credibility. The possession of false identification cards, and assorted activities undertaken therewith, were probative of untruthfulness. The circuit court's subsequent ruling, however, which occasioned Culkin to invoke his fifth amendment privilege in front of the jurors, presents an entirely different problem. We can perceive of no calculation by which the probative value of the prosecution's unanswered questions outweighed the risk of unfair prejudice engendered by compelling Culkin to assert his fifth amendment privilege in front of the jury.[14]

Culkin's credibility had already been attacked by questioning about the Harold Cross identification card. Culkin testified that he made the identification card so that he could adopt Harold Cross's identity. He testified that he used the identification card to open a checking account and that he processed approximately $22,000.00 through the account during a five-month period, although he professed to being unemployed at the time. Similarly, the prosecution questioned Culkin about the rental application, revealing numerous untruths asserted thereon. The additional questions, leading to Culkin's invocation of privilege, were allowed to rebut Culkin's assertion that Thomas was primarily responsible for manufacturing the identification. Accordingly, the marginal probative value of the latter questions with respect to Culkin's untruthfulness would have been

13. We reject Culkin's contention that HRE Rule 609, which generally prohibits impeachment of a criminal defendant by evidence of prior convictions, applies to evidence of pending criminal charges. Looking first to the language employed by the drafters of the rule, *Hill v. Inouye*, 90 Hawai'i 76, 83, 976 P.2d 390, 397 (1998), HRE Rule 609(a) unambiguously proscribes impeachment by evidence of prior *convictions*. Because Culkin had not been convicted of forgery at the time of trial, HRE Rule 609(a) did not apply to questioning about his *possession* of false identification cards.

We note also that this reading of HRE Rule 609(a) is consistent with interpretations of identical language contained in Federal Rule of Evidence 609. While the rules differ as to when and to what extent "evidence that an accused has been convicted of a crime" is admissible, they nevertheless employ identical language. Federal courts that have addressed this issue have held that an indictment or complaint is not a "conviction" for purposes of the rule. *See United States v. Landerman*, 109 F.3d 1053, 1061 n. 12 (5th Cir.1997) *modified on other grounds*, 116 F.3d 119 (5th Cir.1997) (pending state charge is not a conviction under FRE 609); *United States v. Hamilton*, 48 F.3d 149, 153 (5th Cir.1995) (deferred adjudication is not a "conviction" for purposes of FRE 609); *United States v. McBride*, 862 F.2d 1316, 1320 (8th Cir.1988) ("an indictment does not amount to a conviction of a crime" under FRE 609).

14. Preliminarily, we note that Culkin was entirely justified in asserting his fifth amendment right to refuse to testify with respect to questions about other identification cards. While an accused's rights under the privilege are diminished by his act of testifying at trial, *Mitchell v. United States*, 526 U.S. 314, 321–22, 119 S.Ct. 1307, 143 L.Ed.2d 424 (1999), criminal defendants do not, as a general rule, lose the right to invoke the privilege regarding criminal misconduct relevant to the case only because that conduct tends to show the accused's lack of credibility. 1 J. Strong, McCormick on Evidence § 129, at 486–88 (5th ed.1999).

slight. In this case, however, the potential probative value of the questions evaporated when Culkin advised the court that he intended to give no answers.

■ Meanwhile, the risk of unfair prejudice occasioned by compelling a criminal defendant to invoke the fifth amendment privilege in front of jurors is substantial. Generally, claims of privilege must be made outside of the presence of the jury "in order to avoid '[t]he layman's natural first suggestion . . . that the resort to the privilege in each instance is a clear confession of crime.'" 2 J. Weinstein, M. Berger & J. McLaughlin, Weinstein's Evidence, ¶ 513[02] at 513–6 (1996). Inasmuch as the prosecution was advised that Culkin would not answer, we can only conclude that the prosecutor deliberately sought to compel Culkin to invoke the testimonial privilege in the hope that the jurors would, in fact, interpret Culkin's invocation as a "clear confession of crime."

■ Moreover, the circuit court appears to have paid little heed to HRE Rule 513(b), which is quite explicit that, "to the extent practicable," claims of privilege should not be made in front of the jury. Both Culkin and his attorney advised the circuit court that he would not answer questions about other identification cards and would invoke his fifth amendment privilege if asked. With advanced warning, it was certainly "practicable" for the circuit court to avoid this prejudicial questioning. Nor are we persuaded by the prosecution's argument that any error in this regard was harmless because the circuit court admonished the jurors to draw no prejudicial inferences from Culkin's refusal to answer questions. We have repeatedly emphasized that such limiting instructions do not always adequately safeguard the defendant's rights. *See State v. Santiago*, 53 Haw. 254, 258, 492 P.2d 657, 660 (1971). We thus hold that because the circuit court was put on advance notice that Culkin intended to invoke his fifth amendment privilege, the circuit court abused its discretion by permitting the prosecution to question Culkin about the latter identifications.[15]

2. *The circuit court's rulings with respect to character evidence about Thomas*

■ Culkin also argues that the circuit court abused its discretion by precluding admission of certain character evidence about Thomas. HRE Rule 404(a)(2) provides an exception to the general rule that character evidence is not admissible to show conformity therewith and allows "[e]vidence of a pertinent trait of character of the victim of the crime offered by an accused[.]" This exception allows the defense to introduce general character evidence as well as specific prior acts. *State v. Basque*, 66 Haw. 510, 514, 666 P.2d 599, 602 (1983). Culkin contends that the circuit court committed reversible error by excluding: (1) evidence that Thomas had been in prison; and (2) testimony about Thomas's prior reckless use of the handgun that was stored in Culkin's bedroom on the morning of the stabbing.[16]

a. *The circuit court did not abuse its discretion by excluding evidence that Thomas has been in prison.*

■ Culkin contends that the circuit court abused its discretion by excluding evidence that Thomas was incarcerated in fed-

---

15. Inasmuch as we are vacating Culkin's conviction of reckless manslaughter for the reasons set forth in section III.A, *supra*, we need not address whether such error might form an independent basis by which to vacate Culkin's conviction.

16. Culkin also contends that the circuit court abused its discretion by excluding certain testimony by Eric Scott, a friend and professed drug dealer. Scott was apparently prepared to testify about personal observations of Thomas's drug use and violent behavior, as well as about Thomas's "kill or be killed" attitude and that, when under the influence of drugs, Thomas became "psychotic." The circuit court ruled that Scott

could testify as to his personal observations, including acts of physical violence and drug use, but ruled that Scott could not testify that Thomas was psychotic because "[h]e doesn't have any expertise to make that determination." The circuit court similarly precluded Scott from testifying about Thomas's attitude and belief system.

A review of the record, however, reveals that Eric Scott did not testify at Culkin's trial. We therefore fail to see how the circuit court's ruling could have thus prejudiced Culkin and, accordingly, decline to address Culkin's arguments with respect to Scott's testimony.

eral prison for ten years.[17] Thomas was apparently convicted of a drug offense and released approximately nine months prior to the stabbing. At an evidentiary hearing, defense counsel argued that the prison time demonstrated that Thomas had "a belief system obtained from being with hard core federal inmates." She argued that this hard core belief system was relevant to show Culkin's reasonable apprehension that, once the fight began, Thomas "would not stop" and that, "[i]f you crossed him, he was going to take you down." Although not expressly setting forth the basis for its ruling, the circuit court disallowed any reference to Thomas being in prison.

Initially, it is not apparent that the fact that Thomas had spent time in prison was relevant to the reasonableness of Culkin's apprehension or the issue of "first aggressor." No offer of proof was made to the effect that prison automatically instills a "hard-core belief system" in all those who enter its walls. Although defense counsel suggested that Thomas engaged in assorted violent conduct while imprisoned, she made no offer of proof in this regard. *See* HRE Rule 103(a)(2) (1993). Assuming, however, that such evidence was relevant, the circuit court did not abuse its discretion by excluding it in this case. Absent any offer of proof as to violent conduct while in prison, the probative value of Thomas's imprisonment is questionable. And the circuit court declined to allow defense witnesses to testify about Thomas's belief system, opting instead to permit testimony about specific instances of conduct from which jurors could draw their own inferences. Meanwhile, the danger of

undue prejudice from such evidence is readily apparent. The fact of imprisonment raises the possibility that jurors might believe the victim was a bad person who "got what he deserved." *See* E. Cleary, McCormick on Evidence at 572 (3d ed.1984). Under these circumstances, we cannot conclude that the circuit court abused its discretion.

> b. *Testimony about Thomas's ownership and use of the .44 caliber revolver was relevant to the issue of Culkin's reasonable apprehension on the morning of July 27, 1997.*

■ Culkin also contends that the circuit court erred by excluding testimony about four instances in which Culkin witnessed Thomas act in a reckless manner with the handgun that Culkin was holding for Thomas on the morning of the stabbing.[18] The circuit court allowed testimony about Thomas's behavior during these episodes, but permitted no reference to the revolver. The court's decision apparently turned on its determination that the revolver was not relevant to the encounter between Culkin and Thomas. On appeal, Culkin argues that his testimony regarding Thomas's "dangerous and irrational" use of the revolver was critical to substantiate his concern that Thomas might obtain the weapon and also to explain why Culkin removed the weapon from the bedroom following the stabbing.

■ A trial judge's determination of relevancy is reviewed on appeal under the right/wrong standard. *In re Water Use Permit Applications,* 94 Hawai'i 97, 183, 9 P.3d 409,

---

17. The trial court later amended this ruling and permitted the police to recite Culkin's statements to them that Thomas had recently been released from prison and that Thomas thought he was "bad." The court ruled these statements to be spontaneous utterances. Officer Frank Apo testified that Culkin told him, "I killed my brother, man. He just got out of Lompoc pen. And we got in a fight this morning, and he ended up dying." The trial court also permitted Officer James Kinney to testify that Culkin said, "He was going to kill me. I know it. He just got out of the joint, and he thinks he's bad ..."

18. Specifically, Culkin sought to introduce the following: (1) testimony by Thomas's girlfriend that on several occasions Thomas pulled out the

loaded .44 gun because he believed the house was being invaded; (2) testimony by Culkin that he took the gun away from Thomas after he saw Thomas aim it at some neighbors who were picking mangoes in Culkin's backyard; (3) testimony by Culkin that he found Thomas in his bathroom, high on drugs, with a loaded .44 caliber handgun; Culkin took the weapon from Thomas, removed the bullets, and then returned it to Thomas because the gun made him feel safe; and (4) testimony by Culkin that he found Thomas crouched in the dark with a loaded .44 gun. Thomas was high on drugs, paranoid, and convinced that somebody was in the house. At this time, Culkin took the gun away from Thomas and thereafter kept it in his room.

495, *reconsideration denied,* 94 Hawai'i 97, 9 P.3d 409 (2000); *State v. Staley,* 91 Hawai'i 275, 281, 982 P.2d 904, 910 (1999); *State v. Hanapi,* 89 Hawai'i 177, 181, 970 P.2d 485, 489, *reconsideration denied,* 89 Hawai'i 177, 970 P.2d 485 (1999); *State v. Richie,* 88 Hawai'i 19, 36, 960 P.2d 1227, 1244 (1998); *State v. Alston,* 75 Haw. 517, 538, 865 P.2d 157, 168 (1994). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." HRE Rule 401 (1993).

The reasonableness of Culkin's apprehension that Thomas might seriously harm him was certainly a fact in issue. *See* section III.A.1, *supra.* To demonstrate that his fear was reasonable, Culkin sought to admit evidence of Thomas's prior conduct. The circuit court permitted Culkin to testify, and Culkin did testify, about specific instances of conduct. For example, Culkin testified about an incident in which Thomas locked himself inside Culkin's bathroom for two hours. When Culkin finally gained entrance, he discovered not only drug paraphernalia, but that the windows were shut, the blinds were down, and the room was "like a steam bath." Thomas was standing next to the window, peering out, advising Culkin to be quiet because "somebody's up on the roof." Certainly the fact that Thomas was also armed with a loaded revolver was significant. Even if Thomas was not armed on the morning of July 27, 1997, Culkin's knowledge of Thomas's past conduct when under the influence of drugs, combined with the risk to life that Thomas posed, was certainly relevant to the reasonableness of Culkin's claimed apprehension on that morning. Accordingly, we hold that the circuit court erred by ruling that Thomas's past use of the handgun was not relevant.[19]

C. *The Circuit Court Did Not Err by Allowing Jurors to Pose Questions to Witnesses Through the Circuit Court.*

The circuit court participated in a pilot program in which jurors were permitted to ask questions of witnesses. *See* Amended Order Authorizing Implementation of the Pilot Project in Jury Innovations, filed September 4, 1998 (Pilot Project). The Pilot Project provides:

> (b) In the discretion of the Participating Judge, jurors in criminal cases may be allowed to ask questions of witnesses during trial, provided that the questions shall be screened by the Participating Judge and subject to objection by attorneys. The Participating Judge may ask the questions over objection after allowing the objections to be placed [on] the record by the attorneys.

Culkin asserts numerous challenges with respect to questions posed to witnesses and specifically questions posed to himself, during his trial.

1. *Juror questioning of witnesses did not deprive Culkin of his constitutional right to a fair trial.*

■ Culkin first contends that the juror questioning denied him the fair and impartial trial to which he is guaranteed by the fourteenth amendment to the United States Constitution and article I, sections 5 and 14 of the Hawai'i State Constitution. Although Hawai'i courts have not yet addressed the constitutionality of juror questioning, this issue has been addressed by both state and federal courts.

The danger inherent in juror questioning depends, in great part, upon the manner in which the questioning is conducted. As such, juror questioning in the instant case must be distinguished from direct questioning of witnesses by jurors. With reference to questions posed directly to witnesses by jurors, the United States Court of Appeals for the Fourth Circuit has noted:

> Notwithstanding our belief that juror questioning is a matter within the trial court's discretion, we believe that the practice of juror questioning is fraught with dangers which can undermine the orderly progress of the trial to verdict. Our judicial system

---

**19.** The determination that evidence is relevant, of course, does not end the analysis. On remand, the circuit court must also determine whether the proffered evidence, although relevant, should be excluded under HRE Rule 403.

is founded upon the presence of a body constituted as a neutral factfinder to discern the truth from the positions presented by the adverse parties. The law of evidence has as its purpose the provision of a set of rules by which only relevant and admissible evidence is put before that neutral factfinder. Individuals not trained in the law cannot be expected to know and understand what is legally relevant, and perhaps more importantly, what is legally admissible. Since jurors generally are not trained in the law, the potential risk that a juror question will be improper or prejudicial is simply greater than a trial court should take[.]

*DeBenedetto v. The Goodyear Tire & Rubber Company*, 754 F.2d 512, 516–17 (4th Cir. 1985).

Questions posed by jurors in the instant case, however, were carefully reviewed by the court pursuant to procedures established in the Pilot Project. Numerous questions were disallowed after the circuit court determined them to be irrelevant, already answered, or in violation of a motion in limine. By filtering questions through the court, improper and prejudicial questions were eliminated. As such, a majority of the concerns enunciated by the *DeBenedetto* court are not implicated by the questioning of witnesses by jurors in the instant case.

All federal courts of appeal that have considered the issue have determined that juror questioning is permissible in the discretion of the trial court. *United States v. Feinberg*, 89 F.3d 333, 336 (7th Cir.1996); *United States v. Sutton*, 970 F.2d 1001, 1004–07 (1st Cir.1992); *United States v. Lewin*, 900 F.2d 145, 147 (8th Cir.1990); *DeBenedetto*, 754 F.2d at 516; *United States v. Callahan*, 588 F.2d 1078, 1086 (5th Cir.1979); *United States v. Gonzales*, 424 F.2d 1055, 1056 (9th Cir.1970); *United States v. Witt*, 215 F.2d 580, 584 (2d Cir.1954). Several of the federal circuits, however, strongly discourage such questioning.[20] *Feinberg*, 89 F.3d at 336 ("We agree

that the practice [of juror questioning of witnesses] is acceptable in some cases, but do not condone it."); *United States v. Bush*, 47 F.3d 511, 515 (2d Cir.1995) ("Although we reaffirm ... that juror questioning of witnesses lies within the trial judge's discretion, we strongly discourage its use."). At the same time, other circuits more liberally permit juror questioning of witnesses. *See, e.g., United States v. Callahan*, 588 F.2d 1078 (5th Cir. 1979).

In his concurring opinion, Justice Acoba describes juror questioning as "inherently problematic." *See* J. Acoba, concurring op. at ——, 35 P.3d at 259. While we are cognizant of the potential dangers of juror questioning, we are also mindful of the benefits of allowing the trial judge the discretion to allow juror questioning. In *Callahan*, the United States Court of Appeals for the Fifth Circuit approved juror questioning of witnesses conducted in a fashion similar to that authorized by the Pilot Project. 588 F.2d 1078. The *Callahan* court concluded:

> There is nothing improper about the practice of allowing occasional questions from jurors to be asked of witnesses. If a juror is unclear as to a point in the proof, it makes good common sense to allow a question to be asked about it. If nothing else, the question should alert trial counsel that a particular factual issue may need more extensive development. Trials exist to develop truth. It may sometimes be that counsel are so familiar with a case that they fail to see problems that would naturally bother a juror who is presented with the facts for the first time.

*Id.* at 1086. In *Yeager v. Greene*, 502 A.2d 980 (D.C.App.1985), the United States Court of Appeals for the D.C. Circuit added that:

> Questions by jurors also may bring to the court's and counsel's attention improper concerns which can be promptly addressed with cautionary instructions, admonishing the juror who asked the question that the

---

**20.** The United States Court of Appeals for the Second Circuit has held that trial courts abuse their discretion by allowing juror questioning of witnesses without first balancing the potential benefits and disadvantages of the practice. *United States v. Ajmal*, 67 F.3d 12, 14 (2d Cir.1995)

(citing *Bush*, 47 F.3d at 516). In *Ajmal*, the Second Circuit determined that, in the absence of "extraordinary or compelling circumstances," a trial court abuses its discretion by allowing jurors to question witnesses. *Id.* at 14 (citing *Bush*, 47 F.3d at 516).

matter is not relevant to the case and should not be brought to the attention of other jurors or play any part in the inquiring juror's consideration of the case. Additionally ... it seems indisputable that the increased effectiveness of communication with jurors that will result if they are permitted to pose questions to witnesses will aid in finding the truth. As one of the most recent and thorough commentaries on the questioning of witnesses by jurors observed:

> Only when evidence and issues are communicated successfully to jurors can they begin to fulfill their duty to seek truth and deliver a just verdict. But, because the jury is relegated to a passive role, communication in a trial is basically a one-way system—a system notably lacking in ability to insure a reliable communication of evidence or issues to the jury.
>
> Allowing jurors to ask questions of witnesses would promote better and more reliable communication, because a two-way system provides for constant clarification of messages being sent. Understanding testimony more clearly, jurors thus would be able to fulfill their basic function of finding the facts in dispute.
>
> Finally, there is reason to believe that permitting receivers of information, e.g., jurors, to ask questions enhances not only their ability to understand what is being communicated, but results in their putting forth more effort to listen and to understand because they know they may ask questions. A concomitant benefit predictable from these effects might well be a reduced likelihood that the court will be required to intervene to question witnesses or elucidate issues that are clarified by juror questions.

*Yeager*, 502 A.2d at 998–1000 (citations and footnotes omitted).

We are persuaded by the rationale in *Callahan* and *Yeager*, and hold that, because the circuit court allowed questions utilizing a process by which questions tending to elicit improper or inadmissible evidence were excluded, Culkin's right to a fair trial under the fourteenth amendment to the United States Constitution was not jeopardized by the questioning in the instant case.

Turning to Culkin's right to a fair and impartial trial under article I, sections 5 and 14 of the Hawai'i Constitution, "[a]s the highest court of a sovereign state," we are "under the obligation to construe the state constitution, not in total disregard of federal interpretations of identical language, but with reference to the wisdom of adopting those interpretations for our state." *State v. Hutch*, 75 Haw. 307, 322, 861 P.2d 11, 19 (1993) (citing *State v. Texeira*, 50 Haw. 138, 142 n. 2, 433 P.2d 593, 597 n. 2 (1967)) (citation omitted).

A vast majority of state courts that have considered the constitutionality of juror questioning have concluded that it is permissible in the discretion of the trial court. *See, e.g., State v. LeMaster*, 137 Ariz. 159, 669 P.2d 592, 596–97 (Ariz.Ct.App.1983); *Nelson v. State*, 257 Ark. 1, 513 S.W.2d 496, 498 (1974); *People v. McAlister*, 167 Cal.App.3d 633, 213 Cal.Rptr. 271 (1985); *Gurliacci v. Mayer*, 218 Conn. 531, 590 A.2d 914, 930 (1991) (citing *Spitzer v. Haims & Co.*, 217 Conn. 532, 587 A.2d 105 (1991)); *Scheel v. State*, 350 So.2d 1120, 1121 (Fla. 3d DCA 1977); *Rudolph v. Iowa Methodist Med. Ctr.*, 293 N.W.2d 550, 556 (Iowa 1980); *Transit Auth. of River City v. Montgomery*, 836 S.W.2d 413, 416 (Ky.1992); *Commonwealth v. Urena*, 417 Mass. 692, 632 N.E.2d 1200, 1206 (1994); *People v. Heard*, 388 Mich. 182, 200 N.W.2d 73, 76 (1972); *Callahan v. Cardinal Glennon Hosp.*, 863 S.W.2d 852, 867 (Mo. 1993) (citing *Sparks v. Daniels*, 343 S.W.2d 661 (Mo.Ct.App.1961)); *State v. Graves*, 274 Mont. 264, 907 P.2d 963, 966–67 (1995); *State v. Junpp*, 261 N.J.Super. 514, 619 A.2d 602, 610–12 (1993); *People v. Bacic*, 202 A.D.2d 234, 608 N.Y.S.2d 452 (1994); *State v. Howard*, 320 N.C. 718, 360 S.E.2d 790, 795 (1987); *State v. Wayt*, 83 Ohio App.3d 848, 615 N.E.2d 1107, 1112 (1992); *Krause v. State*, 75 Okla.Crim. 381, 132 P.2d 179, 182 (1942); *State v. Munoz*, 67 Wash.App. 533, 837 P.2d 636, 639 (1993).

Some jurisdictions have concluded that juror questioning of witnesses is permissible only where procedural safeguards are employed. *See, e.g., LeMaster*, 669 P.2d at 597;

*McAlister,* 167 Cal.App.3d 633, 213 Cal.Rptr. 271; *Gurliacci,* 590 A.2d at 930 (citing *Spitzer,* 217 Conn. 532, 587 A.2d 105); *Rudolph,* 293 N.W.2d 550; *Callahan,* 863 S.W.2d at 867 (citing *Sparks,* 343 S.W.2d at 667); *Graves,* 907 P.2d at 967; *Jumpp,* 619 A.2d at 611–12; *Munoz,* 837 P.2d at 639. Other jurisdictions have relegated the manner by which jurors may put forth questions to the sound discretion of the trial court. *Nelson,* 513 S.W.2d at 498; *Scheel,* 350 So.2d at 1121; *Montgomery,* 836 S.W.2d at 415; *Heard,* 200 N.W.2d at 76; *Wayt,* 615 N.E.2d at 1112; *Krause,* 132 P.2d at 182. Only a few states have rejected the practice of juror questioning. *See Matchett v. State,* 257 Ga. 785, 364 S.E.2d 565, 566–67 (1988); *Stinson v. State,* 151 Ga.App. 533, 260 S.E.2d 407, 410 (1979); *Wharton v. State,* 734 So.2d 985, 990 (Miss. 1998); *State v. Zima,* 237 Neb. 952, 468 N.W.2d 377, 380 (1991); *Morrison v. State,* 845 S.W.2d 882 (Tex.Crim.App.1992).

In *Morrison,* the Texas Court of Criminal Appeals concluded that the threat to the adversarial structure of the judicial system posed by allowing jurors to question witnesses mandated that such practice not be permitted. *Id.* at 886. The court's analysis began with the premise that "[t]he adversary theory as it has prevailed for the past 200 years maintains that the devotion of the participants, judge, juror and advocate, each to a single function, leads to the fairest and most efficient resolution of the dispute." *Id.* (citation omitted). The *Morrison* court further noted Texas's "staunch loyalty to adversarial principles," a loyalty demonstrated by both its "stated disapproval of the nonadversarial practice of trial judges' examination of witnesses and in its rejection of Federal Rules of Evidence Rule 614 which authorizes judges to call and interrogate witnesses." *Id.* at 888 n. 18. Allowing jurors to question

witnesses, the court reasoned, "encourages jurors to depart from their role as passive listeners and assume an active adversarial or inquisitorial stance." *Id.* at 887. The court concluded that "[t]he benefits of allowing jurors to participate in soliciting evidence are far from clear and fade to insignificance in light of the perils presented to adversarial principles." *Id.*

■ Hawai'i, on the other hand, has long recognized the privilege of trial judges to both summon and question witnesses. *See Kamahalo v. Coelho,* 24 Haw. 689, 694 (1919) (calling witnesses); *Territory v. Kekipi,* 24 Haw. 500, 504 (1918) (questioning witnesses).[21] HRE Rule 614 codifies these principles, permitting a trial court to both interrogate witnesses and call its own witnesses.[22] Thus, while we recognize the benefits of an adversarial system by which judge, juror, and counsel are each devoted to a single function, the "adversarial theory," as it has developed in Hawai'i, does not preclude questioning of witnesses by the trial court.

■ The Pilot Project employed strict safeguards by which juror questions are submitted to and reviewed by the trial judge, with counsel present, and asked of the witness only if appropriate. *See Commonwealth v. Britto,* 433 Mass. 596, 744 N.E.2d 1089, 1105–07 (2001) (offering suggestions for safeguarding juror questioning). With respect to questioning by jurors under a similar framework, an Arizona appellate court held: "[S]ince that [evidentiary] rule specifically authorizes the trial judge to interrogate a witness, we hold he does not abuse his discretion in inviting the assistance of the jury to determine what questions he should ask." *LeMaster,* 669 P.2d at 597. Similarly, allowing jurors to pose questions, pursuant to the Pilot Project, might be viewed as a pro-

21. Of course, the right of judges to question witnesses is strictly circumscribed by the judges' obligation to maintain neutrality. *See State v. Hutch,* 75 Haw. 307, 326–28, 861 P.2d 11, 21–22 (1993); *Territory v. Van Culin,* 36 Haw. 153, 162 (1942); *State v. Pokini,* 57 Haw. 17, 548 P.2d 1397 (1976). By the same token, "the judge is accorded considerably greater discretion in the questioning of witnesses in jury-waived trials and during the hearing of evidentiary motions." *Hutch,* 75 Haw. at 326 n. 8, 861 P.2d at 21 n. 8.

22. HRE Rule 614 (1993) provides as follows:

**Rule 614 Calling and interrogation of witness by court.** (a) Calling by court. The court may, on its own motion or at the suggestion of a party, call witnesses, and all parties are entitled to cross-examine witnesses thus called.

(b) Interrogation by court. The court may interrogate witnesses, whether called by itself or by a party.

(c) Objections. Objections to the calling of witnesses by the court or to interrogation by it may be made at the time or at the next available opportunity when the jury is not present.

**228**

cess by which the circuit court invites the assistance of jurors to determine what questions should be asked.[23]

2. *The circuit court did not abuse its discretion by permitting questions that tended to support the prosecution's theories.*

 Culkin next argues that the circuit court abused its discretion by allowing questions "which tended to elicit testimony supporting the prosecution theories and refused questions which would have tended to support the defense." At the close of Culkin's testimony, the jury submitted eleven questions, many containing several sub-questions, to be asked of Culkin.[24] The circuit court met with both attorneys and discussed each question outside the presence of the jury. The attorneys were allowed to object to questions or express their desire that certain

23. We do not agree with Culkin's argument that the jury's "probing inquiries asking [Culkin] for additional information or explanations" in this case in any way jeopardized his right to a fair trial. Culkin contends that the "investigative nature" of the questions proves that the jurors "had abdicated their role as neutral fact-finders and were actively pursuing evidence which was raised to support the parties' various theories." While undoubtedly the parties raised much evidence to support their various theories, Culkin does not explain how the pursuit of this evidence indicates that jurors abandoned their neutral role. To the contrary, pursuit of such evidence is precisely what juror questioning was designed to promote. *See Callahan*, 588 F.2d at 1086; *Montgomery*, 836 S.W.2d at 416.

Culkin also argues that juror questioning "invited the jurors to prematurely begin the deliberative process." However, the circuit court carefully instructed the jurors to refrain from forming opinions or making judgment about the case until deliberation. The jurors are presumed to have complied with this instruction. *State v. Melear*, 63 Haw. 488, 497, 630 P.2d 619, 626 (1981); *State v. Amorin*, 58 Haw. 623, 629, 574 P.2d 895, 899 (1978); *State v. Kahalewai*, 55 Haw. 127, 129, 516 P.2d 336, 338 (1973). In an attempt to refute this presumption, Culkin points to questions asking why Culkin fled upstairs rather than outside during the confrontation and which brother struck the first blow. He argues that these questions demonstrate that jurors began "judging" prior to deliberation. The first question, which focused on Culkin's state of mind, does not evince judging. And the latter question was clearly a factual inquiry of the type contemplated by the Pilot Project. In the absence of compelling indications of premature deliberations, Culkin has not overcome the presumption that the jurors abided by the court's instructions.

Finally, Culkin argues that juror questioning likely led to speculation by jurors whose questions were not asked. The circuit court, however, instructed the jurors as follows:

Now if your questions are not asked and at least you submit them and they are not asked, please don't feel uptight about it. Again, please don't speculate as [to] what might have been the answer and don't hold it against the attorneys. Again there are lots of reasons. We have rules of evidence that might be complied with, perhaps that particular question might be something that was forthcoming or a future witness is going to answer. So, again, please don't speculate.

In light of these instructions, and in the absence of any evidence to the contrary, it must be presumed the jury abided by the circuit court's unambiguous instructions. *Melear*, 63 Haw. at 497, 630 P.2d at 626; *Amorin*, 58 Haw. at 629, 574 P.2d at 899; *Kahalewai*, 55 Haw. at 129, 516 P.2d at 338.

24. The first question was: "How much was the monthly rent to the house that [Defendant] lived in, in July 1997." There were no objections to this question and it was subsequently posed to Culkin.

The second question was: "What hand did you get the knife with while running by the kitchen counter?" There were no objections to this question and it was asked.

The third question had two parts. First: "Was Defendant afraid that the time taken to put a shirt, hat and sunglasses on would be enough time for his brother to get up?" The prosecution objected, but the question was asked. Second: "After the stabbing, was Thomas moving at all, and did Defendant step over Thomas when going back downstairs?" Neither counsel objected and the questions were asked.

The fourth question was whether Culkin could explain bloody tissue tucked into a torn couch in the living room. The prosecution objected, but the question was asked.

The fifth question included two parts. First: "When you faced your brother Tom with a knife, did you say anything to him?" And second: "Why did you tell your brother where the .44 gun was kept?" Both questions were asked of Culkin over objections by the prosecution.

The sixth question was: "Explain why you felt your life was in danger when your brother attacked you." The prosecution objected and defense counsel wanted the question asked. The court disallowed the question.

The seventh question contained several parts. First: "What is the place on the North Shore where you picked up Tom—a friend's house, a licensed drug rehab. center?" There were initially no objections and the question was given. Later, the court revisited the question and omitted reference to a "drug rehab. center." Second:

questions be asked. Questions that the circuit court deemed irrelevant, already answered, or in violation of a motion in limine, were disallowed. While many questions were asked over objections by the prosecution, on only four occasions did the circuit court's ultimate decision whether to allow a question deviate from the position of defense counsel.[25]

A review of the circuit court's decisions as to the questions reveals no abuse of discretion. The circuit court justified each of its decisions. The justifications appear well-founded and certainly do not exceed the bounds of reason or disregard rules or principles of law or practice to Culkin's substantial detriment. *Lee*, 90 Hawai'i at 134, 976 P.2d at 448. In light of the fact that the prosecution objected to at least eight subsequently asked questions or subquestion, Culkin's contention that the circuit court allowed "questions which tended to elicit testimony supporting the prosecution theories and refused questions which would have tended to support the defense" rings hollow.

3. *The circuit court did not abuse its discretion by allowing cross-examination after juror questioning.*

██ Lastly, Culkin contends that the prosecutor's follow-up questioning "far exceeded" the scope of acceptable cross-examination and amounted to reversible error. In particular, Culkin argues that the prosecutor's cross-examination following his response to jury question numbers 5A and 7B merits reversal due to the prosecutor's harassing and argumentative conduct. Generally, the scope of cross-examination is within the sound discretion of the trial judge. *State*

"Why did you grab a knife (that's a weapon), instead of running out the door if you feared for your safety?" Neither party objected and the question was allowed. Third: "Why didn't you seek professional help for Tom if his drug problem was that bad?" The prosecution objected and the court disallowed the question. Fourth: "On the rental lease, how many adults did you say would be living in the house?" The court disallowed this question as already answered and neither party expressed dissatisfaction with the court's determination. Fifth: "Who initiated the first blow?" The prosecution objected, but the question was allowed.

The eighth question was: "Will Tony, Eric and Janet take the stand?" Both counsels agreed with the circuit court that the question was improper and it was disallowed.

The ninth question had two parts. First: "Why did you say 'how could you do this to me' to Thomas?" The court allowed the question over the prosecution's objection. Second: "Please elaborate on how 'this fight' was different from previous fights with Thomas." Both parties objected and the court disallowed the question.

The tenth question had two parts. First: "In your estimate, how long was Thomas hooked on methamphetamine?" The prosecution objected and the court disallowed the question because it violated a motion in limine. Second: "By having Thomas go to the North shore for drug rehab., was this the only attempt to have Thomas abstain from illicit drugs?" The court disallowed the question.

The eleventh question had five parts. First: "Did you know who Jayne Suarez was prior to a.m. of 7/27/97?" The prosecution objected, but the court allowed the question. Second: "After stabbing brother (Tom), he then dropped to floor." [Defendant's] statement "why did you do this to me?" "What was exact words? Tone of voice?" The court disallowed the question and neither party objected to the court's decision. Third: "Are handguns/shotguns registered?" Both parties objected and the court disallowed the question as not relevant and already answered. Fourth: "Whose house in North Shore, drug rehab?" The prosecution objected and the question was disallowed as already addressed. The fifth part inquired whether the house on the North Shore belonged to a friend or was rented. The prosecution objected and the court disallowed the question.

25. First, the jury sought to inquire why Defendant felt his life was in danger when Thomas attacked him. While defense counsel wanted the question to be asked, the court denied the question after determining Defendant had already addressed the issue during his testimony. Second, the court denied a question as to why Defendant did not seek professional help for Thomas. The court determined that while the fact of addiction was relevant, the question of why Thomas developed an addiction, or what family members did in an attempt to help Thomas overcome his addiction was not. Third, the jury sought to inquire how long Thomas was addicted to methamphetamine. While the defense sought to have the question asked, the court denied it because it violated a motion in limine limiting evidence of addiction to that from within six months prior to the stabbing. Finally, the jurors inquired about the ownership of a house on the North Shore at which Thomas had briefly stayed prior to the stabbing. While the defense sought to have the question asked, the court denied the question because it had been posed by a prior juror question and was repetitive.

*v. Kauhi*, 86 Hawai'i 195, 197, 948 P.2d 1036, 1038 (1997) (quoting *State v. Balisbisana*, 83 Hawai'i 109, 114, 924 P.2d 1215, 1220 (1996)).

■ In analyzing Culkin's argument, the following definition is useful:

A question is argumentative if its purpose, rather than to seek relevant fact, is to argue with the witness or to persuade the trier of fact to accept the examiner's inferences. The argumentative question, in other words, employs the witness as a springboard for assertions that are more appropriate in summation. There is a good deal of discretion here because the line between argumentativeness and legitimate cross-examination is not a bright one. Argumentative questions often tend to harass witnesses[.]

A. Bowman, Hawai'i Rules of Evidence Manual § 12.2, at 618 (2d ed.1998); *see also State v. Sanchez*, 82 Hawai'i 517, 531–32, 923 P.2d 934, 948–49 (App.1996).

Our review of the transcript reveals that the prosecutor's cross-examination of Culkin in response to jury question 5A, although contentious, neither rose to the level of prosecutorial misconduct nor constituted reversible error.[26] To the extent the prosecutor made argumentative comments, the circuit court promptly sustained defense counsel's objections.

■ The prosecutor's cross-examination with respect to question 7B, however, contained improper argument. Jury question number 7B inquired why, if Culkin feared for

his life, he picked up the knife instead of running through a door leading from the kitchen. Culkin responded:

When I came up the stairs, the first thing, I mean, the counter' is right here. The door is right over here. But the door is deadbolted [sic]. I deadbolted [sic] the door. There is no key in it. And he was right behind me. In my mind I had to grab that knife.

During the prosecutor's subsequent cross-examination, several of the prosecutor's statements—for they do not appear to be questions—crossed the line from inquiry to argument:

Q: [(Prosecutor)] ... Let the record reflect that I'm showing the jury and the witness State's Exhibit 6. This door was open, Mr. Culkin. *You could have run out this door.*

. . . .

A: [(Culkin)] My brother was—I would have had to go through my brother to get to that door. I was right next to the stairs. When I got up off the ground, I saw the stairs. That's why I ran for those stairs. I wanted the quickest way out. I had no idea he was going to chase me up the stairs.

. . . .

Q: *Mr. Culkin, you had time to turn around and for your brother to stop, you said, and look at you and look at the knife, and then later, you claim, he charged you. You could have run right out this door from the kitchen.* Your Honor, may the record reflect

**26.** Jury question number 5A inquired, "When you faced your brother Tom with the knife, did you say anything to him?" Culkin responded: "I believe I said get out of my house. This is before he charged me, I take it, if that's the question. It's before he charged me. I believe I said get out of my house." The prosecutor's cross-examination of Culkin included the following:

Q: [(Prosecutor)] Were you yelling at him, Mr. Culkin, get the fuck out of my house?

A: [(Culkin)] I don't know if I said get the fuck out of my house. Possibly I could have said that.

Q: I'm tired of your shit. Does that sound familiar?

A: I don't recall saying that I'm tired of your shit. But it's possible that I could have sworn and said get out of my house or get the fuck out of my house, yes.

Q: Yelling at him?

A: I'm sure it was not in a calm voice. Yes, probably yelling at him.

Q: And you said it more than once? Or once?

A: I don't recall.

. . . .

Q: ... Mr. Culkin, why would you aggravate someone by saying get the fuck out of my house, I'm tired of your shit, if you're so afraid of him?

A: I was afraid of him, yes. I wanted him to stop. I was doing anything I could to try to—

Q: You could have said okay—okay.

. . . .

A: It wasn't a time for polite conversation. It was a split second when we looked at each other. He saw the knife, and he charged me. I didn't have time to say excuse me, let's talk about it, let's sit down and talk about this.

that I'm pointing to the open space that shows the doorway. Straight out through the front door without stopping; isn't that correct, Mr. Culkin?

The transcript reflects that the prosecutor sought not to inquire why Culkin did not run through the kitchen door, but rather to affirmatively state that he could have done so. While appropriate during closing argument, such assertions were improper during cross-examination. However, "the line between argumentativeness and legitimate cross-examination is not a bright one[,]" A. Bowman, Hawai'i Rules of Evidence Manual § 12.2, at 618, and defense counsel interposed no objection to these questions. Moreover, in light of the fact that Culkin was able to answer the prosecutor fully, we discern little prejudice resulting from the prosecutor's conduct. *See, e.g., United States v. Cohen*, 583 F.2d 1030, 1044 (8th Cir.1978) (holding that, viewing the record as a whole, compound questions asked of a defendant were not prejudicial because the appellant "was given full opportunity" to "clarify" the points) (cited in *Sanchez*, 82 Hawai'i at 532, 923 P.2d at 949).

D. *The Circuit Court Did Not Err by Excluding Culkin's Father From the Courtroom.*

■■■■ As his final point of error, Culkin contends that the circuit court erred by ex-

cluding his father from the courtroom as a potential prosecution rebuttal witness.[27] Culkin's primary argument is that the exclusion of his father violated the right to a public trial guaranteed by the sixth and fourteenth amendments to the United States Constitution and article I, section 14 of the Hawai'i State Constitution. However, the right to a public trial and the witness exclusionary rule serve unique and mutually inclusive ends.

■■■■ The witness exclusionary rule serves two important objectives: "It exercises a restraint on witnesses 'tailoring' their testimony to that of earlier witnesses; and it aids in detecting testimony that is less than candid." *Geders v. United States*, 425 U.S. 80, 87, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976) (citing Wigmore, Evidence § 1838 (3d ed.1940); F. Wharton, Criminal Evidence § 405 (C. Torcia ed.1972)). The Commentary instructs that the rule seeks to "discourage or expose fabrication, inaccuracy and collusion." Commentary to HRE Rule 615. Witnesses are generally excluded from trial to prevent the possibility that testimony might be "shaped" to match the testimony of other witnesses. *Bloudell v. Wailuku Sugar Co.*, 4 Haw.App. 498, 504, 669 P.2d 163, 169 (1983).

*Bloudell v. Wailuku Sugar Co.*, 4 Haw.App. 498, 504, 669 P.2d 163, 169 (1983) (internal citation omitted).

This court has not determined whether the mandatory language of HRE Rule 615 applies to potential rebuttal witnesses as well as witnesses in a case-in-chief. To the extent they remain witnesses, the rule suggests potential rebuttal witnesses must also be excluded upon request of an opposing party.

In the instant case, the circuit court complied with the mandatory language of HRE Rule 615. To the extent that the circuit court maintained "a measure of discretion in the application of the rule's exceptions[,]" *Bloudell*, 4 Haw.App. at 504, 669 P.2d at 169, the circuit court did not abuse its discretion or otherwise exceed the bounds of reason or disregard rules or principles of law or practice to Culkin's substantial detriment. *Lee*, 90 Hawai'i at 134, 976 P.2d at 448 (citations and internal quotation signals omitted). While not initially listing Culkin's father as a witness, there are ample reasons why the prosecution might have elicited his testimony. Culkin's father was a potential rebuttal witness to the testimony of Culkin's mother and sister, as well as to the testimony of Culkin himself.

27. The circuit court excluded Culkin's father from the courtroom pursuant to the witness exclusionary rule. The circuit court likewise denied Culkin's request that his father be relieved of the requirements of the rule. Exclusion of witnesses from trial is governed by the rules of evidence. HRE Rule 615 (1993) provides that:

At the request of a party the court *shall* order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion. This rule does not authorize exclusion of (1) a party who is a natural person, or (2) an officer or employee of a party which is not a natural person designated as its representative by its attorney, or (3) a person whose presence is shown by the party to be essential to the presentation of the party's cause.

(Emphasis added.) Hawai'i courts have noted:

The mandatory language of Rule 615, HRE, as well as the federal rule, has been interpreted as requiring the exclusion of all witnesses who do not fit within its exceptions. However, although the exclusion is generally a matter of right, the trial judge retains a measure of discretion in the application of the rule's exceptions.

■ The right to a public trial, on the other hand, embodies "[t]he traditional Anglo–American distrust for secret trials," *In re Oliver*, 333 U.S. 257, 268, 68 S.Ct. 499, 92 L.Ed. 682 (1948), and reflects "the notion, deeply rooted in the common law, that 'justice must satisfy the appearance of justice.'" *Offutt v. United States*, 348 U.S. 11, 14, 75 S.Ct. 11, 99 L.Ed. 11 (1954); *Levine v. United States*, 362 U.S. 610, 616, 80 S.Ct. 1038, 4 L.Ed.2d 989 (1960). Public trials ensure that "the public may see [that a defendant] is fairly dealt with and not unjustly condemned[.]" *Waller v. Georgia*, 467 U.S. 39, 46, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984) (citing *Gannett Co. v. DePasquale*, 443 U.S. 368, 380, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979) (citation omitted)).

■ Accordingly, we hold the right to a public trial is not implicated by the exclusion of a potential witness pursuant to the witness exclusionary rule. Both the witness exclusionary rule and the right to a public trial ensure, *inter alia*, the appearance of fairness at trial. Accordingly, Culkin's argument in this regard is without merit.

## IV. *CONCLUSION*

For the forgoing reasons, we affirm Culkin's conviction of reckless endangering in the second degree, vacate Culkin's conviction of reckless manslaughter, and remand this matter to the circuit court for a new trial.

MOON, C.J., NAKAYAMA, and RAMIL, JJ., and ACOBA, J., concurring separately, with whom LEVINSON, J., joins.

Concurring Opinion of ACOBA, J., with whom LEVINSON, J. joins.

I believe that juror questions in criminal cases significantly alter the structure of trials and that, on remand, the impact of such questioning should be considered by the trial court. I write separately also to emphasize the widely held view that juror questions are inherently problematic.

In many instances, it is not the question posed or the answer given that is of most importance: it is the fact that the question is asked in the first place. As trial attorneys will grasp, the juror question is, in effect, a direct communication to counsel. Therefore, whether a juror question is posed to the witness or not, the question informs counsel of how particular jurors view the case—while evidence is being presented and before the controversy is submitted to the jury.

Inasmuch as the prosecution has both the burden of producing the evidence and the burden of proving a defendant guilty beyond a reasonable doubt, the questioning juror becomes, although unknowingly, an ally of the prosecution, suggesting by his or her questions how the prosecution's case must be shored up or fashioned to obtain a guilty verdict. The impact of such questioning is heightened by other juror "reforms." For example, because jurors are instructed on the elements of the crime at the beginning of the case, their attention is understandably focused on the presence or absence of facts germane to proof of the elements. Juror questions are asked after a witness has already been examined and cross-examined by counsel. Hence, the opportunity to requestion a witness after counsel have conducted their own examination invites the jurors to clarify matters relating to the elements and enlists the jury in the prosecution's proof task. Moreover, allowing another round of examinations by counsel after the court has propounded the juror's questions gives the prosecution the proverbial "second bite" at the apple, to which it would not otherwise be entitled.

So called procedural safeguards in juror questioning do not address the fundamental problem posed by this practice. It is not what questions will be asked or how the questions are asked that is pivotal but, as stated previously, that the questions are asked in the first place, thus providing the prosecution with a preview of the jurors' pre-deliberation positions. The safeguards do not resolve this inherent problem.

As the judge of the facts, the jury must maintain its neutrality and the trial courts are duty-bound to see to that. Doubtless, jurors are not cognizant of the impact their questioning will have on the way attorneys will try the case or of the effect their inquiries can have in advancing the prosecution's

case, because such questioning is sanctioned by the court. Nonetheless, under the procedure for juror questioning, their roles in the trial can change from that of neutral judges. *See* cases cited *infra. Cf. State v. Silva*, 78 Hawai'i 115, 118, 890 P.2d 702, 705 (1995) (holding that judge's questioning in bench trial was unduly extended and aimed at proving prosecution's case). Allowing jurors to ask questions can result in an abridgment of the principles of fair play and justice that must be preserved in criminal trials. As one court stated,

> there is a risk [in allowing jurors to ask questions] of a subtle shift from the role of neutral fact-finder to that of advocate. *See United States v. Johnson*, 892 F.2d 707, 714 (8th Cir.1989) (Lay, J., concurring) (to remain neutral the jury needs to listen to the case as it is developed by the advocates; "if the juror begins to match his [or her] interrogation skills with the lawyer, all of that impartiality is lost.").

*State v. Monroe*, 65 Wash.App. 245, 828 P.2d 24, 29 (1992) (brackets omitted). Thus, while juror questioning is not widely prohibited, even those jurisdictions that do not prohibit the exercise largely advise against the practice because of the problems inherent in it.

### I.

Although the federal courts do not prohibit juror questioning, a majority of federal circuits strongly discourage the use of juror questions. The first circuit court of appeals has cautioned as follows:

> We hasten to add that the practice, while not forbidden, should be employed sparingly and with great circumspection. The dynamics of a criminal trial are extremely sensitive. Innovations that carry the potential for disrupting those dynamics are risky. Juror participation in the examination of witnesses represents a significant innovation, transforming the jurors' role from a purely passive one to a partially interactive one.... We suspect that, *in most situations, the risks inherent in the practice will outweigh its utility. Thus, juror participation in the examination of witnesses should be the long-odds exception, not the rule.*

*United States v. Sutton*, 970 F.2d 1001, 1005 (1st Cir.1992) (footnotes and citations omitted) (emphasis added). The second circuit court of appeals has similarly explained that the practice of allowing jurors to ask questions of witnesses should be curbed:

> Indeed, the courts of appeals have uniformly concluded that juror questioning is a permissible practice, the allowance of which is within the judge's discretion. *Nonetheless, the courts of appeals are similarly unified in their disapproval of the general practice of juror questioning of witnesses.* As we stated in [*United States v.] Bush*, [47 F.3d 511 (2d Cir.1995),] "[a]lthough we reaffirm our earlier holding ... that juror questioning of witnesses lies within the trial judge's discretion, *we strongly discourage its use.*" [*Id.*] at 515....
>
> *In our recent discussion of juror questioning of witnesses, we made clear the danger inherent in such a practice.* See [*id.*] at 525–26. *When acting as inquisitors, jurors can find themselves removed from their appropriate role as neutral fact-finders.* If allowed to formulate questions throughout the trial, jurors may prematurely evaluate the evidence and adopt a particular proposition as to the weight of that evidence before considering all the facts.

*United States v. Ajmal*, 67 F.3d 12, 14 (2d Cir.1995) (some citations omitted) (some brackets and emphases in original and some added).

Of the nine federal circuits that have addressed the issue, six have advised against juror questioning.[1] *See Sutton*, 970 F.2d at 1005; *Bush*, 47 F.3d at 515–16 ("Balancing the risk that a juror's question may be preju-

---

1. Some of the cases cited are outlined in a memorandum to the Hawai'i Committee on Jury Innovations for the 21st Century. The memorandum is contained in Appendix F of the *Hawai'i Committee on Jury Innovations for the 21st Century, Final Report of the Hawai'i Committee on Jury Innovations for the 21st Century: A Report to the Chief Justice of the State of Hawai'i* (1999). It should be noted that, according to this report, the committee approved of juror questions "by a narrow vote of 10 to 8." *Id.* at 7.

dicial against the benefit of issue-clarification will almost always lead trial courts to disallow juror questioning."); *United States v. Polowichak*, 783 F.2d 410, 413 (4th Cir.1986) (holding that juror questions should be allowed only under compelling circumstances); *United States v. Collins*, 226 F.3d 457, 461 (6th Cir.2000) ("There are a number of dangers inherent in allowing juror questions: jurors may prematurely evaluate the evidence and adopt a particular position as to the weight of that evidence before considering all the facts; the pace of trial may be delayed; there is a certain awkwardness for lawyers wishing to object to juror-inspired questions and there is a risk of undermining litigation strategies." (Citation omitted.)); *United States v. Feinberg*, 89 F.3d 333, 336 (7th Cir.1996), *cert. denied*, 519 U.S. 1133, 117 S.Ct. 997, 136 L.Ed.2d 876 (1997) (stating that risks generally outweigh benefits of juror questions in most cases, because, among other things, jurors may engage in "premature deliberation" and become advocates); *United States v. Welliver*, 976 F.2d 1148, 1155 (8th Cir.1992) ("[J]uror interrogation of witnesses presents substantial risk of reversal and retrial.").

Of the three federal courts that do not discourage the practice, two allow it with safeguards and the third has not conducted an in-depth analysis of the issue. *See United States v. Hernandez*, 176 F.3d 719, 723 (3d Cir.1999) ("We take this opportunity to approve of the practice [of jury questioning] so long as it is done in a manner that insures fairness of the proceedings, the primacy of the court's stewardship, and the rights of the accused."); *United States v. Callahan*, 588 F.2d 1078, 1086 n. 2 (5th Cir.1979) ("[C]ourts must ... balance the positive value of allowing a troubled juror to ask a question against the possible abuses that might occur if juror questioning became extensive."); *United States v. Huebner*, 48 F.3d 376, 382 (9th Cir.1994) (upholding juror questioning, but without any analysis of the issue). There-

fore, despite permitting the practice of juror questioning, most federal circuits have urged the district courts to curtail its use.

## II.

Although finding juror questioning constitutional, a majority of State courts nevertheless advise against the practice. As pointed out by the Kansas Supreme Court:

> In keeping with this court's view of trial as a quest for truth, we elect to follow those jurisdictions which permit the practice of juror questions. However, many risks are involved *and a trial court should discourage the practice except when the benefits outweigh the risks.* The litigants have generally employed counsel of their choice who have diligently prepared for trial. *The trial judge and the jury are to be fair and impartial. The appearance of fairness and impartiality is frequently lost when the trial judge or juror becomes involved in questioning a witness.... We again suggest the practice be discouraged—not encouraged.*

*State v. Hays*, 256 Kan. 48, 883 P.2d 1093, 1102 (1994) (emphasis added). In a similar vein, the Texas Supreme Court, in affirming a reversal of a defendant's conviction in a case involving juror questioning, explained that,

> [g]iven the importance of maintaining juror impartiality as fundamental to adversarial integrity, any redefining of the juror's role in the process must be undertaken only when the benefits are exceedingly clear. *The benefits of allowing jurors to participate in soliciting evidence are far from clear and fade into insignificance in light of the perils presented to adversarial principles.*

*Morrison v. State*, 845 S.W.2d 882, 887 (Tex. Crim.App.1992) (en banc) (footnotes omitted) (emphasis added).[2]

---

**2.** The proposition in *Morrison* is not distinguishable from our situation on the ground that questioning by trial judges is disapproved in Texas and permitted in our jurisdiction. Federal Rule of Evidence Rule 614 authorizes federal judges to question witnesses. Yet, most federal circuit courts of appeal discourage juror questioning.

*See* cases cited *supra*. As in federal courts, in this jurisdiction, judges may ask questions of witnesses. *See* Hawai'i Rules of Evidence Rule 614(b) (1993). However, our appellate courts have recognized that such a procedure may result in judicial partiality. *See State v. Silva*, 78 Hawai'i 115, 118, 890 P.2d 702, 705 (App.1995).

Of the thirty-three states that have considered the matter of juror questioning, three states prohibit the practice altogether. *See Stinson v. State*, 151 Ga.App. 533, 260 S.E.2d 407, 410 (1979) ("[A] juror should not be permitted to examine a witness under any circumstances."); *Wharton v. State*, 734 So.2d 985, 990 (Miss.1998) ("Today we hold that juror interrogation is no longer to be left to the discretion of the trial court, but rather is a practice that is condemned and outright forbidden by this court."); *State v. Zima*, 237 Neb. 952, 468 N.W.2d 377, 380 (1991) ("We therefore rule that in the trial courts of this state, juror questioning is prohibited.").

Twelve states allow for juror questioning but discourage its use. *See State v. LeMaster*, 137 Ariz. 159, 669 P.2d 592, 597–98 (Ariz. Ct.App.1983) ("Because of the inherent risks in the practice of allowing jurors to pose questions to the witness, and *the particular danger that a juror will not remain fair and impartial*, we hesitate to condone the court's encouraging jurors to question witnesses to the extent presented in this appeal." (Emphasis added.)); *People v. McAlister*, 167 Cal.App.3d 633, 213 Cal.Rptr. 271, 277 (1985) ("[T]he practice [of juror questioning] is inherently dangerous and should be discouraged."); *Pierre v. State*, 601 So.2d 1309 (Fla. Dist.Ct.App.1992) ("While allowing jurors to ask questions of witnesses is permissible, it is hard to discern the benefit of such practice when weighed against the endless potential for error."); *Hays*, 883 P.2d at 1102; *Commonwealth v. Urena*, 417 Mass. 692, 632 N.E.2d 1200, 1205 n. 7 (1994) ("We note that the questioning of a defendant in a criminal case by jurors may be 'particularly troublesome.'" (Citation omitted.)); *State v. Jumpp*, 261 N.J.Super. 514, 619 A.2d 602, 610 (N.J.Super.1993) ("[W]e believe that the practice of juror questioning is fraught with dangers...."); *State v. Wayt*, 83 Ohio App.3d 848, 615 N.E.2d 1107, 1112 (Ohio 1992) (stating that the practice of juror questioning "is generally not encouraged"; trial court abused discretion by denying defense counsel the opportunity to ask follow-up questions on issue raised by juror question); *Day v. Kilgore*, 314 S.C. 365, 444 S.E.2d 515, 517 (1994) ("One of the most dangerous aspects of allowing juror questions is that a juror may lose his impartiality in the fact-finding process.... We agree with those jurisdictions that discourage juror questions."); *State v. Jeffries*, 644 S.W.2d 432, 434 (Tenn. Cr.App.1982) ("[P]ermitting jurors to ask questions is a perilous practice and should be avoided." (Citation omitted.)); *Morrison*, 845 S.W.2d at 882 (reversing case where juror question was not asked, but question provoked the prosecution to recall a witness to address the juror's concern); *State v. Johnson*, 784 P.2d 1135, 1144–45 (Utah 1989) ("While not encouraged, it is within the trial court's discretion to allow jurors to ask questions in court." (Citations omitted.)); *Monroe*, 828 P.2d at 29 ("Other dangers [of juror questioning] include[:] ... the deliberative process may begin prematurely with juror questions that necessarily reflect deliberative consideration of the evidence.").

Eleven states that neither encourage nor discourage juror questioning advise judges to exercise their discretion with great caution or provide for safeguards that limit the prejudice that results from questioning. *See Ratton v. Busby*, 230 Ark. 667, 326 S.W.2d 889, 898 (1959) ("The fact that the trial judge gave the jury permission to interrogate a witness without any special request from them for the privilege has been held not to constitute error *so long as the questions asked are germane to the issue*." (Emphasis added.) (Citations omitted.)); *Spitzer v. Haims and Co.*, 217 Conn. 532, 587 A.2d 105, 112 (1991) (holding that the evil of permitting premature discussion by jurors is "not inherent in a properly safeguarded procedure of permitting jurors' questions"); *Rudolph v. Iowa Methodist Medical Center*, 293 N.W.2d 550, 556 (Iowa 1980) ("We approve the practice [of juror questions] in principle.... Of course the questions must call for admissible evidence, and trial court discretion must be exercised to prevent abuse of the practice."); *Sparks v. Daniels*, 343 S.W.2d 661, 667 (Mo. Ct.App.1961) ("Of course, a juror is not selected for the purpose of asking questions and can be permitted or denied the privilege by the trial court."); *State v. Graves*, 274 Mont. 264, 907 P.2d 963, 967 (1995) ("While we neither encourage nor discourage the practice of allowing jurors to question wit-

nesses, we, nevertheless, caution trial courts which allow this practice to be ever mindful that the jury's fact-finding role is to be accomplished in a spirit of neutrality, fairness, and open-mindedness."); *Flores v. State*, 114 Nev. 910, 965 P.2d 901, 902 (1998) ("We hold that allowing juror-inspired questions in a criminal case is not prejudicial per se, but is a matter committed to the sound discretion of the trial court. To minimize the risk of prejudice ... the practice must be carefully controlled by the court." (Citation omitted.)); *State v. Rodriguez*, 107 N.M. 611, 762 P.2d 898, 902 (N.M.Ct.App.1988) ("[T]he trial court must carefully consider the possible prejudice which may result from questions submitted by jurors to a criminal defendant...."); *People v. Bacic*, 202 A.D.2d 234, 608 N.Y.S.2d 452, 452 (1994) ("It was within the trial court's discretion to permit jurors to submit written questions of a witness, striking those it deemed improper."); *State v. Howard*, 320 N.C. 718, 360 S.E.2d 790, 794 (1987) ("Questions should ordinarily be for clarification and the trial judge should exercise due care to see that juror questions are so limited."); *Williams v. Commonwealth*, 24 Va.App. 577, 484 S.E.2d 153, 156 (1997) ("We do not discourage trial judges from exercising their discretion to permit juror questioning, provided they adopt procedures that assure control over the process and avoid the pitfalls that have potential for prejudice."); *State v. Darcy N. K.*, 218 Wis.2d 640, 581 N.W.2d 567, 580 (1998), *rev. denied*, 219 Wis.2d 923, 584 N.W.2d 123 (1998) ("If counsel objects [to juror questions], proceeding with juror questions should be supported by findings on the record.").

Four jurisdictions maintain a neutral stance toward juror questioning, commenting only that the matter lies within the discretion of the trial court. *See Lawson v. State*, 664 N.E.2d 773, 780 (Ind.Ct.App.1996) ("While solicitation of jury questions was discouraged under prior case law, given the inclusion of the jury question provision in the Indiana Rules of Evidence, we are not persuaded that a trial court does not have the discretion to incorporate a jury question procedure into a trial."); *People v. Heard*, 388 Mich. 182, 200 N.W.2d 73, 76 (1972) ("The practice of permitting questions to witnesses propounded

by jurors should rest in the sound discretion of the trial court."); *State v. Costello*, 620 N.W.2d 924, 928 (Minn.Ct.App.2001) ("We agree with jurisdictions that find the process is within the discretion of the district court."); *Boggs v. Jewell Tea Co.*, 266 Pa. 428, 109 A. 666, 668 (1920) ("[E]ven jurors may ask questions [in a jury trial]."). One state has only addressed the issue in the context of whether a judge has the discretion not to allow for jury questions and has determined that the trial court indeed has such discretion. *See Gonzalez v. Prestress Eng'g Corp.*, 194 Ill.App.3d 819, 141 Ill.Dec. 606, 551 N.E.2d 793, 799 (1990) (determining that it was not an abuse of discretion for trial court not to allow juror questions because "[n]either legislation nor Supreme Court Rules provide for [it]"). Only two states actually encourage juror questions. *See Transit Auth. of River City v. Montgomery*, 836 S.W.2d 413, 416 (Ky.1992) ("The practice is encouraged with strict supervision by the trial judge, if it is likely to aid the jury in understanding a material issue involved." (Citations omitted.)); *Krause v. State*, 75 Okla.Crim. 381, 132 P.2d 179, 182 (1942) ("We think it proper that a juror ask an occasional question where something has been said by a witness which is confusing to the juror for the purpose of clarifying the matter.").

### III.

It is sometimes said that juror questioning assists in the search for truth. *See Callahan*, 588 F.2d at 1086; *Yeager v. Greene*, 502 A.2d 980, 985 (D.C.App. 1985) (denying writ of mandamus which challenged trial judge's practice of allowing jurors to ask questions because trial judge's related order, attached as an appendix to opinion, and which favored the practice as a truth-finding function, was not an egregious abuse of discretion). That search, however, must take place *within the framework allocating the responsibility for the production of evidence and for sustaining the burden of proof established for criminal cases.* As the Nebraska Supreme Court stated in *Zima*,

Since due process requires a fair trial before a fair and impartial jury, the judicial

process is better served by the time-honored practice of counsel eliciting evidence which is heard, evaluated, and acted upon by jurors who have no investment in obtaining answers to questions they have posed.

... *A change in the system whereby jurors become advocates and possible antagonists of the witness does not on its face suggest a more reliable truth-seeking procedure.*

468 N.W.2d at 379–80 (internal citations omitted) (emphasis added). The *Morrison* court similarly explained that

[a] criminal trial is in part a search for truth. *But it is also a system designed to protect "freedom" by insuring that no one is criminally punished unless the State has first succeeded in the admittedly difficult task of convincing a jury that the defendant is guilty.* Due process and those individual rights that are fundamental to our quality of life [such as the fifth amendment privilege against self-incrimination] co-exist with, and at times override, the truth-finding function.... Evidentiary

barriers to conviction exist, in part, to equalize the contest between the state and the defense by offsetting the abundant resources and the power of the state.

845 S.W.2d at 884–85 (citations and footnotes omitted) (emphasis added). The wisdom of the majority of jurisdictions, both federal and state, is consistent with this view and should be heeded by our trial courts.

Under Hawai'i Rules of Penal Procedure Rule 26(b), juror questioning is permitted in the discretion of the trial judge. Because juror questioning can have a profound impact on the structure of a criminal trial and the roles and functions assigned to the court, the jury, and the parties, refraining from its allowance would be, in my view, the better part of discretion.